This Opinion is a
Precedent of the TTAB

Hearing: August 22, 2013                           Mailed: July 9, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*Harry Winston, Inc.*
*and*
*Harry Winston S.A.*
*v.*
*Bruce Winston Gem Corp.*

————

Opposition No. 91153147

————

Joseph R. Dreitler of Dreitler True LLC for Harry Winston, Inc. and Harry Winston S.A.

Joshua S. Broitman of Ostrager Chong Flaherty Broitman PC for Bruce Winston Gem Corp.

————

Before Kuhlke, Bergsman and Masiello, Administrative Trademark Judges.

Opinion by Masiello, Administrative Trademark Judge:

Bruce Winston Gem Corp. ("applicant") filed an application to register the mark

BRUCE WINSTON in standard character form for goods identified as follows:

> Gemstones, precious and semi-precious, and fine jewelry; namely, bracelets, brooches, chains, cufflinks, earrings, necklaces, pendants, pins, rings, and tie tacks.[1]

---

[1] Application Serial No. 76277029, filed June 27, 2001, under Trademark Act § 1(b), 15 U.S.C. § 1051(b).

Harry Winston, Inc. ("HWI") and Harry Winston Ultimate Timepiece SA instituted the present opposition. On their motion, the Board substituted Harry Winston S.A. ("HWSA") for Harry Winston Ultimate Timepiece SA as a party herein.[2] (HWI and HWSA are collectively referred to as "opposers.")

The case is fully briefed. An oral hearing was held on August 22, 2013.

## I.    **Opposers' claims.**

Opposers allege that they have long been engaged in the business of producing and selling gemstones and all types of jewelry and operating retail stores featuring such goods under the trademarks WINSTON and HARRY WINSTON; and that they are owners of certain registered marks that consist of or incorporate the designations HARRY WINSTON and WINSTON, namely Reg. Nos. 0848629; 1457927; 1457928; 1747040; 2112912; 2390073; 2461192; 2538811; and 2593490. They oppose under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that applicant's mark, when applied to applicant's goods, so resembles such earlier used and registered marks as to be likely to cause confusion, mistake or deception; and on the ground that applicant, in prosecuting its application, knowingly made false statements of material facts, upon which the trademark examining attorney relied, thereby committing fraud upon the United States Patent and Trademark Office.[3]

---

[2] Board order of July 17, 2012, TTABvue # 207. Harry Winston Ultimate Timepiece SA had been merged into HWSA.

[3] Second amended notice of opposition, TTABvue # 35.

## II.  Applicant's answer and counterclaims.

Applicant denied the salient allegations of the notice of opposition, as amended.[4] Applicant stated affirmative defenses of failure to state a cause of action upon which relief may be granted and unclean hands.[5] As applicant did not pursue the affirmative defenses of failure to state a claim and unclean hands, either in its brief or by motion, those defenses are waived. *Research in Motion Limited v. Defining Presence Marketing Group Inc.*, 102 USPQ2d 1187, 1189-90 (TTAB 2012); *Swiss Watch International Inc. v. Federation of the Swiss Watch Industry*, 101 USPQ2d 1731, 1734 n.4 (TTAB 2012).

Applicant counterclaimed for cancellation of all of opposers' pleaded registrations, as follows:

With respect to Reg. Nos. 0848629, 1457927, 1457928, 2112912, 2390073 and 2538811, applicant alleged that opposers discontinued use, with no intent to resume use, of each registered mark with respect to the goods identified in the respective registrations more than three years prior to the pleading.

With respect to Reg. Nos. 1747040, 2461192, and 2593490, applicant alleged that opposers discontinued use, with no intent to resume use, of each registered mark with respect to some of the goods identified in the respective registrations more than three years prior to the pleading.

---

[4] Answer to Second Amended Notice of Opposition, TTABvue # 51.

[5] Applicant also asserted other "affirmative defenses" that were mere amplifications of the denials set forth in the answer or amplifications of applicant's counterclaims.

With respect to Reg. Nos. 0848629, 1457927, 1457928, 2112912, and 2390073, applicant alleged that the registrations "were obtained or have been maintained by fraudulent representations to the PTO that Opposer is using [ ] such trademarks as applied to all goods recited in the subject registrations."[6]

Opposers denied the salient allegations of applicant's counterclaims.[7]

## III.   Earlier disposition of claims in this proceeding.

In the course of this proceeding, the Board dismissed the counterclaim relating to Reg. No. 2538811 and struck from ¶¶ 3 and 4 of the notice of opposition opposers' allegations of ownership of that registration.[8]

On February 6, 2008, HWI voluntarily surrendered Reg. No. 1457928 for cancellation without applicant's consent. The Board entered judgment against opposers on the counterclaim relating to that registration.[9] *See* Trademark Rule 2.134(a).

Reg. No. 1457927 was cancelled as of June 27, 2008, for failure to renew it. After failure by opposers to respond to an order to show cause why such lapse should not be deemed the equivalent of a cancellation by request of opposers

---

[6] *Id.* ¶ 66.

[7] Answer and Affirmative Defenses of Opposers to Counterclaim of Applicant, TTABvue # 57. Opposers also stated affirmative defenses of failure to state a claim upon which relief can be granted and "laches, acquiescence, waiver and/or estoppel," which were not pursued. They are deemed waived.

[8] Order of April 16, 2007, TTABvue # 64.

[9] Order dated September 29, 2008, TTABvue # 88.

without the consent of the adverse party,[10] the Board entered judgment against opposers on the counterclaim relating to that registration.[11]

## IV.   Remaining claims.

To summarize, we have before us:

(A)   opposers' claims on the ground of priority and likelihood of confusion and on the ground of fraud;

(B)   applicant's counterclaims for abandonment and fraud with respect to the following registrations:

> Registration No. 0848629
> Registration No. 2112912
> Registration No. 2390073

(C)   applicant's counterclaims for partial cancellation on grounds of abandonment with respect to the following registrations:

> Registration No. 1747040
> Registration No. 2461192
> Registration No. 2593490

## V.   The record

The record includes the pleadings and, by operation of Trademark Rule 2.122, 37 C.F.R. § 2.122, the application file for applicant's mark and the registration files for those registrations against which applicant has stated counterclaims for cancellation. The record also includes the testimony and evidence set forth below.

### A.   Opposers' evidence.

Opposers made of record, with their first amended notice of opposition,[12] a status and title copy of the following registration:

---

[10] Board order of September 30, 2008, TTABvue # 89.

[11] Board order of July 17, 2012, TTABvue # 207.



2390073             Handwriting instruments, pens, fountain-pens, ballpoint pens, writing pens.[13]

Opposers made of record by notice of reliance (TTABvue # 120)[14] certified copies of the following pleaded registrations showing their status and title:

0848629     **WINSTON**     Jewelry and polished diamonds.[15]

1747040     **HARRY WINSTON**     Jewellery; namely, crowns, necklaces, sets of jewels, brooches, bracelets, rings, earrings, cufflinks; horological and chronometric instruments; namely, wrist-watches, pocket watches, table watches, clocks, alarm-clocks, watch bracelets, bracelet fasteners, watch cases; jewelcases in precious metals, precious and semi-precious stones.[16]

2112912     **HARRY WINSTON**     Handwriting instruments, namely, pens, fountain pens, ballpoint pens, writing pens.[17]

---

[12] TTABvue # 5.

[13] Issued September 26, 2000; affidavit under § 8 accepted; affidavit under § 15 acknowledged; renewed.

[14] Opposers included in this notice of reliance status and title copies of Registrations Nos. 3355622 and 3616973, both in the name of Harry Winston, Inc. Opposers did not plead ownership of either of these registrations or of the applications underlying them in their notice of opposition, as amended, nor do they assert that the pleadings should be amended pursuant to Fed. R. Civ. P. 15(b) to plead these registrations. Accordingly, opposers may not rely upon these unpleaded registrations as bases for their § 2(d) claims. *See* TBMP §314 (3d ed. June 2013).

[15] Issued May 7, 1968; affidavit under § 8 accepted; affidavit under § 15 acknowledged; renewed.

[16] Issued January 19, 1993; affidavit under § 8 accepted; affidavit under § 15 acknowledged; renewed.

[17] Issued November 11, 1997; affidavit under § 8 accepted; affidavit under § 15 acknowledged; renewed.

2461192  **HW**  Watches, bracelet fasteners, watch cases.[18]
**HARRY WINSTON**
**THE OCEAN**
**COLLECTION**

During the pendency of this proceeding, title in all of the pleaded registrations of HWSA was transferred to HWI.[19]

Opposers have made of record testimony and discovery depositions (with exhibits thereto) of the following witnesses:[20]

BRUCE WINSTON, applicant's Chairman. Discovery deposition of March 2, 2006 ("Bruce I") continued on February 28, 2008 ("Bruce II").

ELI NHAISSI, applicant's Chief Executive Officer. Discovery deposition of February 27, 2008 ("Nhaissi I").

RONALD WINSTON, Chief Executive Officer of HWI. Discovery deposition of July 30, 2003 ("Ronald I").[21]

ROBERT SCOTT, Chief Financial Officer of HWI. Discovery deposition of May 24, 2006 ("Scott I").

ROBERT SCOTT. Discovery deposition of February 26, 2008 ("Scott II").

ROBERT SCOTT. Testimony deposition of September 22, 2011 ("Scott III").

ROBERT SCOTT. Rebuttal Testimony deposition of July 18, 2012. ("Scott IV").

DAVID SCHWARTZ, Vice President, Jewelry Merchandising of HWI. Testimony deposition of September 21, 2011.

---

[18] Issued June 19, 2001; affidavit under § 8 accepted; amended (fewer goods) May 27, 2008; affidavit under § 15 acknowledged; renewed.

[19] Even though the title and status of many of the registrations changed after opposers filed copies of the certificates, we take judicial notice of U.S. Patent and Trademark Office records indicating such change of title, as well as those records indicating that all of the registrations have been duly maintained and, accordingly, are subsisting. *See* TBMP § 704.03(b)(1)(A) and cases cited therein at note 17.

[20] Each party has made of record discovery depositions of the adverse party and its officers by means of notice of reliance. *See* 37 C.F.R. 2.120(j); TBMP § 704.09.

[21] Discovery depositions of opposers' own officers and employees are submitted by stipulation of the parties of July 29, 2009, TTABvue # 114.

SUZY KORB, Executive Vice President of Marketing and Design of HWI. Discovery deposition of February 28, 2008.

CATHERINE LACAZE, Vice President - Jewelry Marketing of HWI. Testimony deposition of September 23, 2011 (continued on September 26, 2011).

MOUNIA MECHBAL, Vice President of International Watch Marketing of HWI. Testimony deposition of September 20, 2011.

MARIA PILAR AREVALO-MERENES, Retail Watch Planning for HWI. Testimony deposition of September 19, 2011.

THOMAS BURSTEIN, Senior Vice President and Senior International Jewelry Specialist, Christies' Auctioneers. Testimony deposition of September 27, 2011.

JAMES F. HAAG, JR., Managing Director, Jacob & Company. Discovery deposition of May 24, 2006.[22]

CAROLINE ANDERSON, independent business researcher. Testimony deposition of September 26, 2011.

ELAINE HOWARD, independent jeweler. Testimony deposition of August 19, 2009.

MITCHELL W. DUSTIN, proprietor, Northern Appraisal Services. Testimony deposition of August 11, 2009.

EDWARD LEWAND, independent jewelry appraiser and consultant. Testimony deposition of September 26, 2011.

CAROL BRODIE GELLES, former global director of communications of HWI. Discovery deposition of May 22, 2006.[23]

NATHAN AKSELROD, former Vice President of the Rough Diamond Division of HWI. Rebuttal testimony deposition of May 3, 2012.

GERARD J. SCHULTZ, former Executive Vice President and Chief Financial Officer of HWI. Rebuttal testimony deposition of May 2, 2012.

HARRY SCHUKAR, formerly in diamond and jewelry sales for HWI. Rebuttal testimony deposition of July 11, 2012.

---

[22] Submitted under the July 29, 2009 stipulation.

[23] Submitted under the July 29, 2009 stipulation.

Opposers have also made of record notices of reliance upon the following categories of evidence:

Declarations of Bruce Winston (TTABvue #116).[24]

Applicant's responses to opposers' first set of interrogatories (TTABvue #126).

Court decisions from prior litigation between the parties (TTABvue ## 117, 119).

News articles from publications of general circulation or the internet (TTABvue ## 118; 146-147; 154; 156-159; 160; 162).

Advertisements from magazines of general circulation (TTABvue ## 148; 159).

Books of general circulation (TTABvue ## 145; 149-152; 163; 164).

Annual reports of Harry Winston Diamond Corporation, available online (TTABvue ## 153, 155).

Presentation of advertisements of HWI prepared by The New Yorker (TTABvue ## 161; 197).[25]

**B.     Applicant's evidence.**

Applicant has made of record testimony and discovery depositions (with exhibits thereto) of the following witnesses:

BRUCE WINSTON, Chairman of applicant. Testimony deposition of December 5, 2011 ("Bruce III").

ELI NHAISSI, Chief Executive Officer of applicant. Testimony deposition of December 7, 2011 ("Nhaissi II").

RONALD WINSTON, former Chief Executive Officer of HWI.[26] Testimony deposition of December 2, 2011 ("Ronald II").

---

[24] These declarations have been entered into the record pursuant to the July 29, 2009 stipulation. *See* 37 C.F.R. § 2.123(b); *L'Oreal S.A. v. Marcon,* 102 USPQ2d 1434, 1435 n.2 (TTAB 2012).

[25] Allowed by Board order of December 15, 2011 (albeit stricken in part).

[26] Ronald Winston, who was the Chief Executive Officer of HWI at the beginning of this proceeding, ended his business association with HWI in 2008.

CHISTA GHAFFARI, Executive Vice President of applicant. Testimony deposition of December 6, 2011.

CHARLES WINSTON, independent jewelry dealer. Testimony deposition of November 30, 2011 ("Charles").

Applicant has also submitted notices of reliance on the following:

Official record of proceedings of September 2, 2010, in the U.S. District Court for the Southern District of New York in *Bruce Winston Gem Corp. v. Harry Winston, Inc. et al.*, 09 Civ. 07352 (JGK) (TTABvue # 176).

Opposers' responses to applicant's first and second sets of interrogatories (TTABvue #177).

Opposers' admissions in response to applicant's requests for admissions (TTABvue ## 178-185).

Certain filings in this proceeding, *i.e.*, Applicant's Motion to Compel Document Production and Rule 30(b)(6) Witness, filed April 2, 2008; opposers' brief in opposition to that motion; and applicant's reply brief.[27]

## C. Stipulation of facts.

The parties entered into a Stipulation of Facts dated August 6, 2003, as to the authenticity of certain documents, including advertisements of opposers; news articles and press clippings; catalogues of the auction houses Sotheby's and Christie's; retail prices of opposers' goods; as to the fact that such advertisements and news articles refer to opposers and their products as "Harry Winston," and that such press clippings are representative of the media in which opposers advertise.

## VI. Evidentiary matters.

### A. Evidentiary objections of opposers.

(1)     Opposers moved to strike Exhibits 1 and A attached to applicant's brief on the case.[28] Both are charts that summarize evidence of record. Exhibit 1 shows

---

[27] All allowed by Board order of March 28, 2012.

applicant's sales, as evidenced by invoices submitted as Exhibits 42 and 43 of the Nhaissi testimonial deposition. Exhibit A is a chart purportedly tabulating the usage of the designation WINSTON in certain evidence of opposers. Such summaries of the evidence, if accurate, are not inappropriate. They are in the nature of argument, not evidence. The motion to strike is denied.

(2)    Opposers objected to the December 2, 2011, testimonial deposition of Ronald Winston (Ronald II) *in toto*, on grounds of "bias, prejudice and impeaching prior inconsistent testimony."[29] Opposers also point to off-record conversations between the witness and applicant's counsel, which were allegedly inappropriate because opposers' counsel had previously represented Ronald Winston when he appeared in this proceeding as a Rule 30(b)(6) witness for opposers (Ronald I). Opposers' counsel objected strenuously at the time of the deposition to which opposers now object, and the incident appears to have precipitated an abrupt end to the deposition. Applicant contends that opposers' objection is untimely, as it should have been filed with opposers' brief on the case instead of with their reply brief.

Inasmuch as applicant relied on the testimony in question to argue its counterclaim in its brief on the case at pp. 27 and 48-49, we find that the objection was seasonably raised.[30] However, we are not persuaded that the witness's 2011

---

[28] Motion filed January 8, 2013.

[29] Objection filed January 8, 2013.

[30] While applicant filed the deposition transcript prior to opposers' filing of their brief, opposers could not then have known whether applicant would rely on it.

testimony is clearly inconsistent with his 2003 testimony; nor that his 2011 testimony is biased or prejudicial to opposers. The objection is overruled.

## B.     Evidentiary objections of applicant.

(1) Applicant objects to opposers' reliance on Reg. No. 0848629, on the ground that applicant has made out a *prima facie* case that the mark has been abandoned. The objection is overruled.

(2) Applicant objects on hearsay grounds to printed publications submitted by opposers "to the extent that Opposers… intend to rely upon them to establish common law use of the HARRY WINSTON and WINSTON marks."[31] We do not treat such materials as proving the truth of the matter asserted in them. However, such publications can be used to demonstrate promotion of the mark by its owner, public perceptions of the mark by others, and other issues relevant to this proceeding. The objection is overruled.

(3) Applicant objects to numerous categories of evidence[32] to the extent offered to establish the fame and strength of the mark WINSTON. In each case, applicant's objection is essentially a critique of the probative weight of such evidence, rather than its admissibility. Accordingly, the objections are overruled.

---

[31] Applicant's brief at A5.

[32] The evidence consists of: (i) printed publications; Exhibits 103-105; Exhibits 100, 107, 124-126, 128 and 131 and "related Lacaze Testimony"; (ii) Exhibits 120-123, 140, 155, and related testimony of Lacaze and Anderson; (iii) Exhibits 9, 16, 17, 19, 44, 56, 58, 60, 65, 66, 98, 99, 106, 110, 115-119; Rebuttal Exhibit 2, Notice of Reliance TTABvue ## 155/153, and related testimony of Scott; (iv) Notices of Reliance TTABvue ## 145, 150/152, 163, 164, 151/149, 171 and Exhibits 141, 211, 212 and 213; and (v) Exhibits 50, 51, 192, 199 and related testimony of Schwartz and Burstein.

With respect to Scott Exhibits 65 and 66 and related testimony of Robert Scott, Chief Financial Officer of HWI, applicant argues that the valuations of the HARRY WINSTON mark should be given no probative value because "no witness with first-hand knowledge testified as to how these valuations were computed."[33] Opposers respond that HWI's chief financial officer Robert Scott testified as to "his intimate involvement and participation in [the valuations'] preparation"; that he "provided the financial data upon which the valuations were based"; and that he "gave a detailed explanation of the valuation methodology."[34] We admit the valuations under the hearsay exception for records of a regularly conducted business activity. Fed. R. Evid. 803(6).[35]

With respect to the Schwartz Testimony referring to documents HW-3762, -3777, -3778, -3781-3782 and -3784, which allegedly are missing from Exhibit 50, the Board obviously will give no consideration to exhibit pages that were never filed. However, we see no need to strike "any testimony referring to these documents." To the extent that the witness testifies upon personal knowledge, we will consider the testimony for whatever probative value it may have.

(4) Applicant objects on hearsay grounds to Notices of Reliance TTABvue ## 118 and 158 (consisting of articles from magazines and periodicals) and to testimony of Howard, Haag, Merenes, Akselrod, Schultz, Schukar, Scott, Ronald

---

[33] Applicant's brief at A11.

[34] Opposers' responses to applicant's objections, p. 3, TTABvue # 251.

[35] Mr. Scott testified that a valuation is conducted every two years in compliance with the terms of a credit agreement. Scott III 53:11-14.

Winston, and Charles Winston, to the extent that the testimony is offered to show "that Bruce Winston had no reputation in the jewelry industry" or "that Bruce Winston wanted to trade on the Winston family name." Applicant concedes that the articles "are admissible and probative only for what they show on their face," but not for the truth of the matters contained therein, citing TBMP § 704.08. Applicant's objections to the testimony are based on the witnesses' testifying as to "third-party out of court statements" and, in the case of Howard, as to "newspapers articles she read" *[sic]*. As a general matter, we do not treat testimony as to third-party out-of-court statements as proof of the truth of the matter asserted. The same is true for published articles. However, such materials are frequently competent to show, on their face, matters of relevance to trademark claims (such as public perceptions), regardless of whether the statements are true or false. Accordingly, they will not be excluded outright, but considered for what they show on their face. The objection is overruled.

(5) Applicant objects to the submission of the Howard Testimony as "expert witness testimony," on the ground that the witness did not properly qualify as an expert. Fed. R. Evid. 702. The objection is sustained and we will read her testimony as that of a lay member of the jewelry trade.

(6) Applicant objects to the Burstein Testimony relating to statements made to the witness by a customer about a jewelry purchase the customer had made. Burstein 170:5-171:6. The testimony in question recounts an incident of a purported impulse purchase that the witness personally observed. The account does not

depend upon the customer statement to which applicant objects. The objection is overruled.

(7) Applicant objects to specific testimony of Gelles, Lewand and Burstein to the extent it is submitted as evidence of actual confusion. Gelles 52-53; Lewand 36; Burstein 50. (Applicant has not pointed to any instance in which opposers have referred to the cited testimony as evidence of actual confusion.) As grounds therefor, applicant contends that the Gelles and Lewand testimony is hearsay, offered for the truth of the matter asserted; and that Burstein's testimony is improperly offered as expert testimony. We agree that the cited testimony does not illustrate actual confusion, but see no cause to exclude it outright as it may have probative value for other purposes. The objection is overruled.

(8) Applicant objects to Notices of Reliance TTABvue ## 146-147, Exhibits 83-97 and related Scott and Burstein testimony relating to Stephanie Winston Wolkoff, Bruce Winston's daughter. For the reasons discussed herein in Part VII(C)(3)(d), we overrule the objection.

## VII. <u>The merits.</u>

### A. The Parties.

Opposer HWI is a New York corporation organized in 1932 as Harry H. Winston Jewels, Inc. It changed its name in 1936 to Harry Winston Inc.[36] At all relevant times HWI has been engaged in the production and sale of fine jewelry. By all reports, the primary public representative of the business was its founder, Mr.

---

[36] Scott III Exhibit 55-A.

Harry Winston, who attracted for himself and for his business substantial attention from the press.[37] Upon Mr. Harry Winston's death in 1978, his son Ronald Winston became HWI's chief executive officer and held that position until about 2004. After Mr. Harry Winston's death, ownership of the company was shared by Ronald and a trust for the benefit of Harry's other son Bruce Winston.[38] Between 2000 and 2006 or 2008, 100% of the shares of HWI passed, in stages, to a Canadian entity called Aber Diamond Corporation,[39] which subsequently changed its name to Harry Winston Diamond Corporation.[40] At the time of trial, all shares of HWI were held by a holding company called Harry Winston Holding Company, Inc., which was wholly owned by Harry Winston Diamond Corporation.[41]

Opposer HWSA is a Swiss entity that is wholly owned by HWI. It was organized in 1955[42] and manufactures watches that are sold through retail salons of HWI and through wholesale watch distributors.[43]

Applicant is a New York corporation organized in 2002 to market fine quality jewelry.[44] Applicant bears the name of Bruce Winston, the son of Mr. Harry Winston. Bruce Winston is the chairman of the company.[45]

---

[37] *See* opposers' notice of reliance, TTABvue ## 156 and 157.

[38] Schultz 28:13-24.

[39] Scott IV 20-23:3. *Cf*. Ronald II 6:3-5.

[40] Scott III 17-19.

[41] *Id*. 17:21-25.

[42] Scott III 15:19-21.

[43] *Id*. 22:9-15.

[44] Nhaissi II 7:5-8; applicant's brief at 8.

The goods for which opposers and applicant are primarily known are costly, high-end pieces of jewelry characterized by particularly large gemstones, large numbers of gemstones, or both. The nature of the goods gives them durable value and there is a substantial secondary market for opposers' goods.

### B. Applicant's counterclaims.

We begin by considering applicant's counterclaims for cancellation of the pleaded registrations. Applicant has standing based on opposers' assertion of their marks and registrations against applicant in their notice of opposition. *See Ohio State University v. Ohio University*, 51 USPQ2d 1289, 1293 (TTAB 1999) ("[A]pplicant's standing to assert the counterclaim arises from applicant's position as a defendant in the opposition and cancellation initiated by opposer"). *See also Finanz St. Honore B.V. v. Johnson & Johnson*, 85 USPQ2d 1478, 1479 (TTAB 2007).

### 1. Cancellation of Reg. No. 0848629.

Registration No. 0848629, which issued in 1968, relates to the mark WINSTON for "jewelry and polished diamonds." Applicant states two grounds for cancellation: abandonment; and fraud in the maintenance of the registration.

### a. Abandonment of the mark WINSTON.

A claim for cancellation of a registration may be filed at any time if the registered mark has been abandoned. 15 U.S.C. § 1064(3). A mark is considered abandoned when "its use has been discontinued with intent not to resume such use"; and "nonuse for 3 consecutive years shall be prima facie evidence of

---

[45] Bruce I 10:10.

abandonment." 15 U.S.C. § 1127. In its recent decision in *Crash Dummy Movie LLC v. Mattel Inc.*, 601 F.3d 1387, 94 USPQ2d 1315 (Fed. Cir. 2010), our primary reviewing court summarized the abandonment standard as follows:

> A showing of a prima facie case creates a rebuttable presumption that the trademark owner has abandoned the mark without intent to resume use. The burden then shifts to the trademark owner to produce evidence that he either used the mark during the statutory period or intended to resume use. The burden of persuasion, however, always remains with the [challenger] to prove abandonment by a preponderance of the evidence.

*Id.* at 1316 (citations and internal quotation marks omitted).

Applicant argues that at least since 2003, opposers "intentionally discontinued using the WINSTON mark on all jewelry (as a 'hallmark' and otherwise)…";[46] and that they "stopped selling 'loose' (or 'polished') diamonds to the public and to the trade before 2000, and when [HWI] did sell 'loose' (or 'polished') diamonds prior to 2000 they were sold 'unbranded.'"[47] Applicant maintains that it has made out a *prima facie* case of abandonment, relying upon the definitions in Section 45 of the Trademark Act: "Nonuse for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. Applicant admits that HWI "re-commenced use of the WINSTON mark on jewelry in 2007, shortly after [Applicant] filed its

---

[46] A "hallmark" is, quite literally, a trademark ("a mark or device placed or stamped upon an article of trade to indicate origin, purity, or genuineness" (WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1023 (1993)). The expression is commonly used in the jewelry trade because it originated as a word for a particular type of mark stamped on gold and silver articles. *See id.*

[47] Applicant's brief at 48-49.

counterclaims for abandonment and fraud in this proceeding."[48] We will consider separately the issue of use of the mark on jewelry and on polished diamonds.

### i. **Jewelry.**

In support of its claim that opposers ceased use of WINSTON on jewelry, applicant cites the testimony of Ronald Winston at Ronald I 95:18-20 and 56:25-57:23. We note in particular:

> A.     … I believe we are now stamping Harry Winston which is a fairly recent thing. There are probably tens and tens of thousands of products marked Winston.
>
> Q.     At least perspectively *[sic]* would you agree that your predominant presentation is Harry Winston or HW?
>
> A.     I believe so, yes.

Ronald I 56:21-57:4.

> Q.     Do you presently stamp your items with the entire name Harry Winston?
>
> A.     Yes.

Ronald I 95:20.

This testimony, taken in 2003, cannot fairly be read to prove that HWI discontinued using WINSTON at least as of 2003, as applicant contends. At most, the witness testified that, at the time of the deposition, HWI predominantly used HARRY WINSTON and HW as its marks. It is apparent from the record as a whole that WINSTON is not opposers' *primary* trademark; clearly HARRY WINSTON is the company's primary trademark. However, ongoing use of WINSTON as a

---

[48] *Id*. at 52. *See also* Schwartz Exhibit 53 (sales of jewelry stamped WINSTON after 2007).

subsidiary mark is not inconsistent with Ronald's testimony as to the company's predominant marks. Applicant's efforts to demonstrate that opposers' uses of HARRY WINSTON are so predominant as to eclipse uses of the mark WINSTON do not demonstrate an abandonment of use of the mark WINSTON.

Applicant also argues that HWI has produced no financial records "tied to the sale of goods bearing the WINSTON mark" for the period 2003 to 2007; and that evidence of use of WINSTON on jewelry is limited to historical use as a 'hallmark' many decades ago and to recent use as a 'hallmark' that commenced no earlier than 2007."[49] In view of the lack of evidence of use, applicant urges the Board to "[infer] that such evidence would be unfavorable to Opposers or that it does not exist."[50]

The evidence of record shows otherwise. David Schwartz, who was responsible for "the production, manufacturing, and fabrication of all of the jewelry products" of HWI "from 2004 on,"[51] identified photographs of several pieces of jewelry that were stamped with the mark WINSTON and were manufactured in the periods from 2004-2005 and 2005-2006, based upon their series numbers.[52] Mr. Schwartz testified that the company continued to stamp jewelry with the mark WINSTON from 2000 to the time of his 2011 deposition,[53] and had on-hand in 2009 substantial

---

[49] Applicant's brief at 49.

[50] *Id*.

[51] Schwartz 7:6-12; 76:12.

[52] *Id*., 44:8-14 and Exhibit 51. He also testified that he had seen items of Harry Winston jewelry marked "Winston" from the 1950's, 60's, 70's, 80's and 90's. *Id*. 75:13-76:12.

[53] Schwartz 43:16.

inventory of items stamped WINSTON.[54] Thomas Burstein, who was Vice President-US Retail of HWI from 2005 to 2011, identified advertisements for "Winston diamond band rings" and "Winston Emerald cut ring," which he described as being for sale while he was with the company.[55] On February 28, 2008, Suzy Korb, HWI's executive vice president of marketing and design, testified that she owns a "recently made" ring that is marked WINSTON alone, which was purchased by her husband "in the last two or three years."[56] At the time, she was also wearing "another piece" borrowed from HWI's inventory to wear to an appointment with a journalist, "and if you'd like to inspect it, it's marked Winston."[57] She further testified that she has input into the preparation of advertisements and "I use the word 'Winston' by itself in advertising, but the logo is the logo, the official logo of the company."[58] Ms. Korb's immediate predecessor, who was with HWI from 1998 to 2005, testified that during his employment the company marketed to the bridal segment of the market a diamond called "the Winston cushion";[59] and that the company produced a bridal catalogue called "the Winston Diamond."[60]

Carol Brodie Gelles, who was HWI's director of communications from 1997-2005, testified that the company used the expression "the Winston diamond" to

---

[54] *Id*. 45:8-12 and Exhibit 52.

[55] Burstein 122:13-124:9 and Ex. 192.

[56] Korb 27:4-20; 33:17.

[57] *Id*. 35:24-36:4.

[58] *Id*. 59:6-15.

[59] Haag 28:7-22.

[60] *Id*. 28:2-3.

differentiate the quality of HWI's solitaire diamond from other jewelry houses' solitaire diamonds.[61] She also testified that the designation "House of Winston" "appear[ed] on marketing materials" during the relevant time frame.[62]

Although the evidence showing that HWI physically stamped its goods with the mark WINSTON during the precise 2004-2006 period of alleged non-use is relatively sparse (*i.e.*, Schwartz 44:8-14 and Exhibit 51), it is sufficient to rebut applicant's showing, which is largely based on an inference to be drawn from a lack or a scarcity of evidence.

Even if there were no clear evidence of use of WINSTON during 2004-2006, and even if we found that applicant had made out a *prima facie* case of abandonment under 15 U.S.C. § 1127, the evidence discussed above is highly inconsistent with a lack of intent to resume use. The evidence shows, on the part of HWI, a healthy interest in use of the WINSTON mark as well as extensive actual use over a long period of time both immediately before and immediately after the period of alleged abandonment. In 2003, the company issued a catalogue that made extensive use of the mark WINSTON and identified a large number of individual items with that mark ("Winston diamond chain"; "stacked Winston diamond bands"; "Winston cluster diamond pin"; "Classic Winston diamond cluster bracelet"; "Winston

---

[61] Gelles 21:7-22:2.

[62] *Id*. 45:11-46:25. We note in this connection that the record is replete with examples of use of "house" as a term generally applicable to high-end jewelry firms. *See, e.g.*, Dustin 101:21-24; Lewand 24:3-4; Haag 66:24-68:7; Haag Ex. 3; Charles 101:21-24; Burstein 250:10-11; Lacaze 17:2-25. Thus, in the context of this industry, the term WINSTON in such a designation retains a separate commercial impression.

diamond grid bracelet"; "Winston cluster earrings"; "Winston cluster brooch"; "Winston diamond initial pendant").[63] Ms. Korb's ring, purchased new in the two or three years prior to February 2008, if not clearly made during the 2004-2006 period, must have been made and offered for sale shortly after such period.

In light of the evidence at Schwartz 44:8-14 and Exhibit 51, showing newly manufactured jewelry stamped WINSTON from the periods 2004-2005 and 2005-2006, applicant has failed to demonstrate a hiatus of use for the statutory three-year period. Further, in light of the other evidence discussed above, which shows continued advertising use of the mark by HWI and substantial sales of jewelry stamped WINSTON after 2007, the preponderance of evidence does not support a showing of a lack of intent to resume use even if there were such a hiatus. Accordingly, applicant has not demonstrated that opposers abandoned use of the mark WINSTON for jewelry.

### ii. Polished diamonds.

Even though applicant did not explicitly plead a claim for *partial* abandonment of Reg. No. 0848629, we will consider applicant's claim of abandonment of the WINSTON mark with respect to "polished diamonds" because the resolution of this issue will be relevant to applicant's fraud claim.

---

[63] Lacaze Exhibit 136. *See also* Exhibits 134-137, containing references to" Winston diamond," "Winston spirit," "Winston style," "a Winston moment," and "Winston Standard Time."

To support its contention that opposers abandoned use of WINSTON for polished diamonds, applicant points to Ronald Winston's 2011 testimony[64] that HWI ceased to sell "loose diamonds" by 2000; that HWI was not marketing loose diamonds in 2008; and that when the company did sell loose diamonds, "They were sold as an unbrand[ed] product." Ronald II 16:15-17:2.  Applicant's focus on "loose diamonds" does not directly address the question before us, because the registration under challenge refers not to "loose diamonds" but to "polished diamonds."  In prosecuting its counterclaim, applicant appears to have avoided exploring the meaning in the trade of the expression "polished diamonds," preferring to assert, without proof, that the term "loose diamonds" is synonymous with "polished diamonds."  We note that the question of whether a "polished diamond" must in all cases be "loose" is controverted in the record.  *See* Scott II 111:5 and 15-22.  However, we need not resolve this issue. As explained below, even if "polished diamonds" is synonymous with "loose diamonds," applicant's claim fails.

Assuming the above noted testimony is an adequate *prima facie* showing of partial abandonment, the burden of production shifts to opposers, and we find opposers have rebutted the *prima facie* case. Specifically, the testimony of Ronald Winston is contradicted by the 2008 testimony of Suzy Korb, HWI's Executive Vice President of Marketing and Design ("We do present loose stones in our stores and in exhibitions so that we can then design a piece of custom jewelry around it." Korb 26:4-7) and Robert Scott, HWI's Chief Financial Officer ("We do sell loose diamonds,

---

[64] Ronald's relationship with opposers terminated in 2008; in his 2011 deposition he testified on behalf of applicant.

but primarily the diamonds are mounted in rings, but we do sell loose diamonds, yes." Scott II 42:6-8. *See also* Scott II 138:18-20.). In 2006, Carol Brodie Gelles, HWI's former global director of communications, also testified that she believed the company sold loose diamonds. Gelles 23:18-24:2.

We consider the testimony discussed above in the context of the record as a whole, which demonstrates that an important segment of opposers' business involves the provision of extremely costly and sometimes unique goods to extremely affluent customers. The importance of custom service in opposers' business is also apparent in the record. *See* Schwartz 7:6-12; Korb 26:4-7; Gelles 33:25-34:5 ("There was nothing that Harry Winston will not produce if requested by a client. Custom orders, that's the business. Sixty percent of Harry Winston's business when I was there was custom orders."); *see also* Burstein 170:5-24 (witness's account of procuring a vivid blue diamond in two days at request of a customer, in 2007 or 2008, at a cost between $2.5 and $3 million). We note also the importance in opposers' business of identifying, at the time of sale, the specific stones that are incorporated into a piece of jewelry by their carat weight, their clarity, and other technical characteristics. The stones are frequently identified by their individual certification numbers issued by the Gemological Institution of America.[65] In this context, we find that the testimony of Ronald is outweighed by the other conflicting testimony and evidence of record, and that applicant has failed to demonstrate by a

---

[65] *See, e.g.*, Scott III Exhibit 56 at HW 6570 (invoice for earstuds identifying the diamonds by weight, clarity, color and GIA certification numbers). *See also* Howard 11:5-7 ("If you're buying… an important diamond, you would typically buy a stone that has a GIA cert with it.").

preponderance of the evidence that HWI ceased offering loose diamonds. As this is the only factual showing made by applicant in support of its claim, we find on the present record that applicant has failed to establish that HWI abandoned the WINSTON mark with respect to "polished diamonds."

### b. Fraudulent maintenance of Reg. No. 0848629.

We next turn to applicant's claim that HWI maintained Reg. No. 0848629 by means of fraud on the Patent and Trademark Office. Applicant contends that HWI "filed a Section 8 and 15 Affidavit in 1973 and renewed the registration in 1988 and 2008, at all times declaring to the PTO that the mark WINSTON is currently being used on both 'jewelry' and 'polished diamonds' (including 'loose' diamonds) even though Opposers have never used the mark WINSTON on 'loose' diamonds."[66] Applicant contends that such filings constituted a "false, material representation with the intent to deceive the PTO that it was using the WINSTON mark on all goods in the registration while knowing that it had never manufactured, marketed or sold 'loose' diamonds under the WINSTON brand."[67]

Fraud in procuring a trademark registration or renewal occurs only when an applicant or registrant knowingly makes a false, material representation with the intent to deceive the United States Patent and Trademark Office. *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938, 1941 (Fed. Cir. 2009). "Subjective intent to deceive, however difficult it may be to prove, is an indispensable element in the

---

[66] Applicant's brief at 33. To be clear, no maintenance filing for this registration ever alleged that HWI was using the WINSTON mark on "loose" diamonds.

[67] Applicant's brief at 52-53.

analysis." *Id*. A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof. *Id., citing W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.*, 377 F.2d 1001, 153 USPQ 749, 750 (CCPA 1967).

Applicant's brief cites no evidence to show that the original registration was obtained fraudulently, or to show that either the 1973 or 1988 maintenance filings were fraudulent. The remaining question is whether HWI's May 7, 2008 statement that it was using its mark on all the goods identified in the registration was fraudulent.

As is discussed above in Part VII(A)(1)(a), applicant failed to establish cessation of use of the mark WINSTON on jewelry,[68] and also failed to show that HWI ceased offering "loose diamonds." Thus, on the present record, applicant has failed to demonstrate the falsity of any statement of HWI.[69] In the absence of such a showing, applicant's claim of fraud with respect to Reg. No. 0848629 cannot succeed.[70]

---

[68] We note, moreover, that despite applicant's argument that use of WINSTON on jewelry was discontinued between 2004 and 2006, applicant admits that "Opposers re-commenced use of the WINSTON mark on jewelry in 2007…." (Applicant's brief at 52.) Applicant has adduced no evidence to show a change between 2007 and May 7, 2008 that would render false HWI's statement that it was using its mark on jewelry.

[69] We note further that the record reveals no meaningful inquiry into the state of mind of any person who signed an application or maintenance document relating to the challenged registration. No showing of a subjective intent to deceive (an essential element of a fraud claim) arises from this record.

[70] We have noted applicant's argument that HWI's 2008 renewal application was improper for the additional reason that the specimen of use submitted was allegedly not adequate evidence of use, with the implication that the requested renewal should have been refused. (Applicant's brief at 33 and 54, n.26.) However, an alleged error in the examination of an application or of an application for renewal cannot form the basis of an *inter partes* challenge to the registration of the mark. *AS Holdings, Inc. v. H & C Milcor, Inc.*, 107

###### 2. Cancellation of Reg. Nos. 1747040 and 2461192.

Applicant states, in the "Recitation of Facts" section of its brief, that "Reg. Nos. 1747040 and 2461192 are void and should be canceled based upon Opposers' misrepresentations of use."[71]  On this point, applicant's recitation of facts states, in its entirety:

> The evidence of record is clear and convincing that Opposers never used the HW HARRY WINSTON or HW HARRY WINSTON THE OCEAN COLLECTION marks on many of the goods listed in these registrations, including table watches, pocket watches, alarm clocks, jewel cases, watch bracelets, bracelet fasteners and watch case, but Opposers filed statements of use of these marks in renewal applications anyway.[72]

No arguments on this point appear in the "Argument" section of applicant's brief.

Opposers apparently interpreted applicant's brief as having bypassed the issue of these two registrations, stating:

> Although Applicant asserted a claim for cancellation of all of Opposers' registered marks, in its Trial Brief, it asserts that only Registration No. 0848629 -- WINSTON – should be cancelled.[73]

In response to this assertion, applicant stated:

> Opposers did not challenge cancellation of the '040 and '192 registrations. Instead, they incorrectly assert that BWG's counterclaim for cancellation is limited to the '629

---

USPQ2d 1829 (TTAB 2013), *citing Saint-Gobain Abrasives, Inc. v. Unova Indus. Automation Sys., Inc.*, 66 USPQ2d 1355 (TTAB 2003) ("It would be manifestly unfair to penalize defendant for non-compliance with a requirement that was never made by the Examining Attorney.").

[71] Applicant's brief at 34.

[72] *Id*. at 33-34, *citing* testimony and exhibits from Scott I, II, and IV.

[73] Opposers' reply brief at 14 n.38.

> registration. [Citation omitted.] However, BWG showed in its Trial Brief that the '040 and '192 registrations are void and should be canceled based upon Opposers' misrepresentations of use in obtaining and/or maintaining these registrations.[74]

To the extent that applicant's brief contains arguments regarding Reg. Nos. 1747040 and 2461192 (all of which are quoted above), it appears to argue that they should be cancelled on a theory of fraud ("misrepresentations of use"). Applicant also pleaded claims for partial cancellation on grounds of abandonment with respect to both registrations.[75] For the sake of completeness, we will consider each ground for cancellation with respect to each registration.

### a.    Fraud claim regarding Reg. No. 2461192.

It is clear that no claim of fraud was pleaded as to Reg. No. 2461192. The counterclaim contains no recitation of facts regarding any false statement related to this registration; and the registration number is not listed in the statement of applicant's "SECOND GROUND FOR CANCELLATION BASED ON FRAUD" (¶¶ 65-69).[76] Neither does the ESTTA cover sheet accompanying applicant's counterclaims refer to fraud as a ground for cancellation of this registration. As there was no pleading of fraud with respect to Reg. No. 2461192, we will not entertain the claim. *Syngenta Crop Protection Inc. v. Bio-Chek LLC*, 90 USPQ2d

---

[74] Applicant's reply brief at 1 fn1.

[75] *See* Applicant's Answer to Second Amended Notice of Opposition, Affirmative Defenses and Counterclaims, ¶ 51.

[76] *Id.*, ¶ 66: "Upon information and belief, Opposer's registrations for the trademarks WINSTON (Nos. 848,629 and 1,457,927), HARRY WINSTON (No. 1,457,928), HW HARRY WINSTON (No. 2,112,912) and HW (No. 2,390,073) marks were obtained or have been maintained by fraudulent representations to the PTO that Opposer is using the [*sic*] such trademarks as applied to all goods recited in the subject registrations."

1112, 1115 n.3 (TTAB 2009); TBMP § 314 ("A party may not rely on an unpleaded claim.").

### b. Fraud claim regarding Reg. No. 1747040.

Reg. No. 1747040 is not among the registrations listed under applicant's "SECOND GROUND FOR CANCELLATION BASED ON FRAUD" (¶¶ 65-69).[77] This fact raises the troubling question as to whether opposers had fair notice of a claim of fraud regarding this registration. However, facts stating an allegation of fraud regarding this registration were recited in ¶ 58 of the answer and counterclaim; and the ESTTA coversheet of the answer and counterclaim indicates that fraud is a ground for cancellation of this registration. *See PPG Industries Inc. v. Guardian Industries Corp.*, 73 USPQ2d 1926, 1928 (TTAB 2005) (the ESTTA cover sheet is read in conjunction with the notice of opposition as an integral component).

Upon review of applicant's arguments and the cited testimony and exhibits relevant to this claim, we find that applicant has failed to make out a *prima facie* case of fraud. Nothing in the record or the arguments addresses or demonstrates in any meaningful way the requisite subjective intent of opposers' representatives to deceive the USPTO when they filed renewal or maintenance papers. In the cross-examination of Robert Scott (Chief Financial Officer of HWI), applicant's counsel presented Mr. Scott with copies of the file wrapper relating to Reg. No. 1747040 (Scott IV Exhibit 53) and discussed with him the accuracy of the statements made

---

[77] *Id.*

therein on behalf of Harry Winston Ultimate Timepiece SA. The application, filed on February 7, 1992, was signed by Urs Lindt, the company's manager; the Section 8 / Section 15 declaration, filed on January 19, 1998, was signed by Michel Pitteloud, the company's General Manager; the application for renewal, filed on December 20, 2002, was signed by Maximilian Bosseu and Patrick Thiessoz, the company's Managing Director and Finance Director, respectively. The discussion of these filings with Mr. Scott (*see* Scott IV 60:7-72:9) was ineffective to reach the issue of the subjective intent of these employees of HWI's Swiss subsidiary with respect to the filings they made.[78] Without a showing of this essential element of the claim, applicant's fraud claim cannot succeed.

### c. **Abandonment claim regarding Reg. No. 2461192.**

On February 26, 2008, HWSA filed with the Trademark Office's Post Registration division a request under Section 7 to amend Reg. No. 2461192 by deletion of all goods except "watches, bracelet fasteners, watch cases." The goods deleted by means of HWSA's amendment were:

> precious metals and their alloys sold in bulk; goods of precious metal or coated therewith, namely, crowns, necklaces, sets of jewels, brooches, bracelets, rings,

---

[78] We note also that the discussion of the accuracy of the statements as to use of the mark at issue on particular goods does not lead to particularly clear conclusions. For example, after Mr. Scott admitted that, to his knowledge, Harry Winston had never marketed "table watches" and "pocket watches" (Scott IV 64:4-17), he later stated (still under cross-examination), "We sell primarily wrist watches, but there are other types of watch products that we have manufactured and sold over the years. It may not be our primary part of our business, but we are a watch manufacturer and a seller of watches, and I believe it is accurate, yes." (*Id*. 69:9-15.) When pressed as to his admission regarding pocket watches, he stated, "I said I am not aware. I did not say it has never sold pocket watches." (*Id*. 69:19-20.)

earrings, cufflinks; jewel cases in precious metals; precious and semi-precious stones; jewelry, precious gemstones; chronometric instruments, and clocks, watch bracelets; chronometers.

The amendment was approved as of May 27, 2008. It was incorrect of HWSA to file its Section 7 request with the Post Registration division rather than with the Board. A registration that is subject to a cancellation claim may not be "amended or disclaimed in part, except with the consent of the other party or parties and the approval of the Trademark Trial and Appeal Board, or upon motion granted by the Board." 37 C.F.R. § 2.133(a). Had HWSA moved the Board for permission to amend the registration, as the rules require, the Board would ordinarily have required, as a condition to approving the amendment, that HWSA consent to entry of judgment with respect to the deleted goods. *See* TBMP § 514.01. Applicant's counterclaim, as pleaded, alleged abandonment with respect to "precious metals and their alloys sold in bulk, clocks."[79] We accordingly enter judgment on applicant's claim for partial cancellation on grounds of abandonment with respect to precious metals and their alloys sold in bulk and clocks.

### d. Abandonment claim regarding Reg. No. 1747040.

Regarding Reg. No. 1747040, applicant's arguments with respect to non-use focus on goods identified as "table watches, pocket watches, alarm clocks, jewelcases, watch bracelets, bracelet fasteners and watch case."[80] The evidence shows that opposers do not market, as individual items, table watches, pocket

---

[79] Applicant's answer to second amended notice of opposition, ¶ 51(b) (TTABvue # 51).

[80] Applicant's brief at 33-34

watches, jewelcases, and bracelet fasteners. *See* Scott IV 60:7-66:10. Mr. Scott's testimony, as between 2008 and 2012, is somewhat inconsistent as to alarm clocks and watch bracelets. In 2008, Mr. Scott stated that opposers did not sell watch bracelets "as a stand alone product," but as "a component of the watch." Scott II 136:24-137:5. In 2012, he stated that opposers do sell watch bracelets alone: "Well, if a customer wants to purchase a diamond bracelet they can purchase a diamond bracelet for their watch. The bracelets are interchangeable." Scott IV 62:7-12. He also stated in 2008 that opposers did not sell alarm clocks. Scott II 136:17. In 2012, he contended that opposers do market "timepieces that do have alarms," albeit only in the form of a wrist watch. Scott IV 61:10-20.

With respect to "watch bracelets," we find the witness's later explanation that opposers would provide a bracelet alone upon the request of a customer to be consistent with the nature of opposers' business. Opposers offer their goods at extremely high prices and the evidence shows that they willingly customize their goods at a client's request. Schwartz 7:6-12; Korb 26:4-7; Gelles 33:25-34:5. Therefore, we deny applicant's counterclaim for cancellation on grounds of abandonment with respect to watch bracelets.

With respect to "alarm clocks," we find that they are different in nature from wrist watches having alarms.

The evidence demonstrates that opposers never offered "table watches," "pocket watches," "alarm clocks," "bracelet fasteners," and "jewelcases in precious metals, precious and semi-precious stones" under the mark in Reg. No. 1747040.

Accordingly, we enter judgment on applicant's claim for partial cancellation on the ground of abandonment with respect to these goods.

### 3. Cancellation of Reg. Nos. 2112912 and 2390073.

Applicant pleaded claims for cancellation of Reg. Nos. 2112912 and 2390073 on grounds of abandonment and fraud. However, applicant's brief does not address these claims, and we deem them waived. *See* TBMP § 801.01; *Knight Textile Corp. v. Jones Investment Co.,* 75 USPQ2d 1313, 1314 n.4 (TTAB 2005).

### 4. Cancellation of Reg. No. 2593490.

Finally, we address applicant's counterclaim for partial cancellation of Reg. No. 2593490 as to "precious metals and their alloys sold in bulk, clocks."[81] This registration was cancelled on April 18, 2009, for failure to file a declaration of use under Trademark Act § 8. The Board noted the cancellation of this registration in its order of July 17, 2012, but the Board took no action at that time. Applicant has shown no interest in further pursuing this counterclaim and makes no mention of it in its briefs. Accordingly, we deem the counterclaim to be moot. *See C.H. Guenther & Son Inc. v. Whitewing Ranch Co.*, 8 USPQ2d 1450, 1452 (TTAB 1988).

### C.   Opposers' claim under Section 2(d).

We turn now to the merits of opposers' claim under Trademark Act § 2(d) that applicant's mark, when applied to applicant's goods, so resembles opposers' earlier used and registered marks as to be likely to cause confusion, mistake or deception.

---

[81] Applicant's Answer to Second Amended Notice of Opposition, ¶ 51 and ¶¶ 60-64.

### 1. **Standing.**

HWI has properly made of record several pleaded registrations of marks that consist of or include the designations WINSTON and HARRY WINSTON and has demonstrated use of both those designations in connection with jewelry. HWSA has demonstrated use of the mark HARRY WINSTON and variations thereof in connection with watches. Opposers have thus shown that they are not mere intermeddlers and have established their standing to oppose registration of applicant's mark. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson,* 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); and *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

### 2. **Priority.**

In view of opposer HWI's ownership of valid and subsisting registrations of its pleaded marks which have not been cancelled pursuant to the counterclaims or opposers' failure to maintain them, priority is not in issue with respect to the trademarks and goods identified in those registrations. *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974). Notably, opposers have not pleaded ownership of any registration that subsists at this time for the mark HARRY WINSTON in standard character form; and HWSA is no longer the owner of any pleaded registration. Inasmuch as opposers have sufficiently pleaded their common law rights in the word mark HARRY WINSTON and, indeed, allege that it is famous, they must prove their ownership of and prior rights in that mark.

Applicant filed the application at issue on June 27, 2001 and it may rely upon that date as its constructive date of first use. Trademark Act § 7(c), 15 U.S.C. § 1057(c). Applicant does not contend that it actually used the mark BRUCE WINSTON earlier than 2002.[82]

The record is replete with evidence of the operations of HWI in the gemstone and jewelry trade under the name and mark HARRY WINSTON for decades previous to applicant's filing date through the time of trial. *See, e.g.*, the depositions of Gerard Schultz (executive vice president and chief financial officer of HWI from 1953-1990); Nathan Akselrod (vice president of the rough diamond division of HWI from 1961 to 1995); James Haag (vice president of marketing of HWI from 1998 to 2005); and Robert Scott (corporate controller and later chief financial officer of HWI between 1991 and the time of trial).

The record also shows that opposer HWSA was incorporated in 1955 in Geneva, Switzerland, and commenced the manufacture and sale of watches in the United States under the HARRY WINSTON brand in 1988 or 1989.[83] The record shows that HWSA continued to produce and sell such watches at the time of trial.[84]

Accordingly, we find that both opposers have demonstrated rights with respect to the common law mark HARRY WINSTON in connection with jewelry, gemstones and watches and that such rights were acquired prior to the applicant's filing date.

---

[82] Applicant's brief at 8; *see also* Nhaissi II 7:5; 40:13-14; and Exhibits 42 and 43 (earliest invoice of sale dated November 26, 2002.

[83] Scott III 15:16-24; 22:9-20; 23:3; Mechbal 23:11.

[84] Mechbal 41:25-43:17 and Mechbal Exhibit 7; Mechbal 45:23-25 and Mechbal Exhibit 9.

### 3. **Likelihood of confusion.**

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion, as set forth in *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973).

### a. **The parties' goods.**

We first consider the similarity or dissimilarity and nature of the parties' goods. In opposition proceedings in which the opposer has pleaded a registration, we look to the express wording of the application and registration at issue for purposes of an analysis under Section 2(d). *Octocom Syst. Inc. v. Houston Computers Svcs. Inc.*, 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *In re Elbaum*, 211 USPQ 639, 640 (TTAB 1981), *citing Kalart Co., Inc. v. Camera-Mart, Inc.*, 119 USPQ 139 (CCPA 1958). The identification of goods appearing in the application, which defines the scope of the registration that applicant seeks, is:

> Gemstones, precious and semi-precious, and fine jewelry; namely, bracelets, brooches, chains, cufflinks, earrings, necklaces, pendants, pins, rings, and tie tacks.

Among opposers' pleaded registrations, we note that HWI owns Registration No. 0848629 for the mark WINSTON for "Jewelry and polished diamonds," and Registration No. 1747040 for the design mark for:

> Jewellery; namely, crowns, necklaces, sets of jewels, brooches, bracelets, rings, earrings, cufflinks; horological and chronometric instruments; namely, wrist-watches, clocks, watch bracelets, watch cases.

The parties' goods are, in part, identical or legally identical. Both the application and the HARRY WINSTON (and design) registration cover necklaces, brooches, bracelets, rings, earrings, and cufflinks. The broadly identified "jewelry" in the WINSTON registration encompasses within its scope all of the jewelry items described in the application. Moreover, applicant's "gemstones, precious and semi-precious" encompass within their scope the "polished diamonds" in the WINSTON registration.

While the identifications are broad in terms of the type of jewelry offered or the channels of trade the parties may employ, the evidence submitted by the parties reveals that the similarities between the parties' goods go beyond the general terminology appearing on the application and the registrations listed above.[85] In this case, the jewelry for which both parties are primarily known is characterized by particularly large gemstones in very opulent settings that often feature large numbers of smaller precious gemstones. It is not unusual for the structural parts of the jewelry item, such as the chain of a necklace or the band of a ring, to be encrusted with diamonds or other stones. *See*, for example, Nhaissi II Exhibit 40, BW 1074 (BRUCE WINSTON fancy yellow diamond ring with gold band set with diamonds all around); and Nhaissi II Exhibit 41, BW 1092 (necklace of 9 large emeralds and 18 smaller diamonds on a chain of numerous smaller diamonds). *Compare to* Lacaze Exhibit 136, showing diamond necklace consisting of alternating

---

[85] The similarities between the types of goods actually marketed by applicant and opposers are considered not as a limitation on the identifications of goods in the application and the relevant registrations, but in regard to opposers' common law rights in the mark HARRY WINSTON and to show the actual range of the parties' respective goods.

round and marquise diamonds; and diamond bands, set all around with diamonds. Testimony indicates that the style of HARRY WINSTON jewelry is one of "minimalistic use of metal, a very strategic placement of the prongs and the settings to hold the diamonds in a way that create [*sic*] the vantage point by the viewer to see the stones…, as well as the fact that he was very well known for large, major gemstone-intensive products, putting together color and diamonds or all diamonds in clusters of shapes and styles that over the years have become identified as Winston style." Schwartz 55:4-19. BRUCE WINSTON jewelry has been described as similar in style to HARRY WINSTON jewelry. Burstein 172:8-12; Lewand 26:5-17; Lacaze 124:8-125:22; Schwartz 55:20-57:3.

Needless to say, such jewelry is very costly. Applicant's chief executive officer described the price range of BRUCE WINSTON products as "a few thousand to a few hundred thousand and in some special cases, a few million dollars." Nhaissi I 114:3-5. He identified items of BRUCE WINSTON jewelry as priced between $100,000 and $900,000. Nhaissi II 14:4-15:18 and Nhaissi II Exhibits 40 and 41. However, invoices for goods sold also showed a pair of engraved wedding bands priced under $1000 and a loose diamond priced under $5000. Nhaissi II Exhibit 42. In 2003, HWI's chief executive described the retail price range of HARRY WINSTON jewelry as $5000 to $5 million. Ronald I 14:24-25.

In short, the *du Pont* factor of the similarity or dissimilarity of the goods weighs in favor of a finding of likelihood of confusion, both in regard to the goods identified in the application and the pleaded registrations and in regard to the goods that the parties actually sell.

### b. Channels of trade; customers.

Because the parties' goods are in part identical, as identified in the application and relevant registrations, we must presume that the channels of trade and classes of customers are the same. *See American Lebanese Syrian Associated Charities Inc. v. Child Health Research Institute,* 101 USPQ2d 1022, 1028 (TTAB 2011); *In re Smith and Mehaffey,* 31 USPQ2d 1531, 1532 (TTAB 1994). *See also In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012). Applicant, in its brief, describes its business as "sell[ing] fine jewelry, diamonds and gemstones… at wholesale prices to private customers, dealers or merchants upon recommendation or referral on an appointment only basis from its business offices…."[86] However, the identification of goods in the application is not limited to wholesale customers or to sales by referral or by appointment. Neither is it limited to sales in a business office. *See Stone Lion Capital Partners, LP v. Lion Capital LLP*, __ F.3d __, 110 USPQ2d 1157, 1162 (Fed. Cir. 2014) (finding it proper for the Board to focus on the identification of goods set forth in the application "rather than on real-world conditions"). Accordingly, we presume that applicant's goods move in all channels of trade normal for the identified goods, and that they are available to all classes of purchasers for those goods. *See, e.g., Paula Payne Products Co. v. Johnson Publishing Co.,* 473 F.2d 901, 177 USPQ 76, 77-78 (CCPA 1973). We note that applicant's goods are identified as "fine" jewelry, which implies that the goods are relatively costly. However, the evidence indicates that this category of jewelry may

---

[86] Applicant's brief at 19.

include items that cost as little as $5000 in opposers' case,[87] and as little as $1000 in applicant's case.[88] Accordingly, the universe of potential customers for the parties' goods is relatively broad. There is no question that both parties make an appeal to the extremely affluent. However, both may also sell to less affluent purchasers who are willing to make a substantial expenditure for a special occasion (*e.g.*, for wedding bands or an engagement ring). In any event, considering the goods identified in the application and the pleaded registrations, there is no question that the parties' likely customers and trade channels must be considered the same. This factor, therefore, weighs in favor of a finding of likelihood of confusion.

### c. The fame of opposers' marks.

In this proceeding, opposers maintain that the marks WINSTON and HARRY WINSTON are famous in the field of jewelry and that "This fame extends not only to the relatively small class of affluent people who would be actual customers but to the general public."[89] Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992). Because of the extreme deference that we accord a famous mark in terms

---

[87] Ronald I 14:24-25; Haag 26:18-25.

[88] Nhaissi II Exhibit 42.

[89] Opposers brief at 38.

of the wide latitude of legal protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting that its mark is famous to clearly prove it. *Leading Jewelers Guild Inc. v. LJOW Holdings LLC*, 82 USPQ2d 1901, 1904 (TTAB 2007). To summarize their showing of fame, opposers state that they "have introduced evidence of sales in the billions, advertising and marketing expenditures in the millions, and editorial mentions valued in the millions over an eighty year period."[90]

It is clear from the record that Mr. Harry Winston, the founder of HWI, was a highly skilled promoter of his business and of himself. Mr. Harry Winston's activities in buying and selling unusually large gemstones were a matter of intense interest in the press throughout his career and, from the 1930s onward, he was discussed in terms suggesting his personal fame. In 1936, Damon Runyon compared him to the manager of celebrated boxer Joe Lewis because he had purchased the Jonkers diamond.[91] Cosmopolitan magazine published a profile entitled "King of Diamonds" in April 1947.[92] In 1949, Time and The New Yorker magazines detailed his acquisition of the Hope diamond and the Star of the East in articles that discussed other notable acquisitions of his,[93] and in 1954 The New Yorker, in a very lengthy profile, stated, "'Genius' is a word that is subjected to a good deal of kicking around when diamond men get to talking about Winston. 'Harry Winston started

---

[90] *Id.*

[91] "Harry Winston, Diamond Champ," New York American Sports, April 24, 1936, opposers' notice of reliance TTABvue # 156.

[92] TTABvue # 156.

[93] *Id.*

with nothing and became the biggest man in the business,' a man working for a rival firm said not long ago."[94] In 1975, he was referred to as "The Wizard of Rocks."[95] In 1978, he was called "Ace of Diamonds."[96] In 1978, an obituary referred to him as "a World Leader in Diamond Trade."[97]

Mr. Harry Winston used a number of high-profile publicity techniques to promote his business; and after his death in 1978, HWI continued to use many of the same techniques. For example, Mr. Winston's donation of the Hope diamond to the Smithsonian Institution in 1958 attracted substantial attention in the press and continued to be noted for years thereafter.[98] Over the years, HWI has maintained its association with the Hope diamond and the Smithsonian Institution. When, in 1997, the Smithsonian renovated its displays of geology, gems and minerals and named one of the rooms in its National Museum of Natural History The Harry Winston Gallery (which featured the Hope diamond), HWI pursued an aggressive public relations campaign through print, television and radio media, resulting in a large amount of press coverage.[99] The campaign resulted in press impressions

---

[94] "The Big Stone – I," The New Yorker, May 8, 1954, p. 36, at TTABvue # 156.

[95] "Harry Winston: The Wizard of Rocks," W, January 24, 1975, p. 4, at TTABvue # 157.

[96] "Harry Winston: Ace of Diamonds," Reader's Digest, January 1978, p. 183, at TTABvue # 157.

[97] "Harry Winston, a World Leader in Diamond Trade, Is Dead at 82," The New York Times, December 9, 1978, at TTABvue # 157.

[98] See articles at TTABvue # 154.

[99] See Press Activity Report for opening of The Harry Winston Gallery at The Smithsonian Institution, including numerous press clippings, at Lacaze Exhibit 107.

estimated at 118,818,631 readers.[100] In 2010, on the fiftieth anniversary of the donation of the Hope diamond to the Smithsonian Institution, HWI designed a new, temporary, setting for the diamond and undertook another extensive public relations campaign that resulted in a great deal of press coverage.[101]

Mr. Winston publicized his business and himself by mounting an exhibition of notable gems, called "The Court of Jewels," which toured nationwide and abroad from 1949-1953. The exhibit, which benefited The National Foundation for Infantile Paralysis, was promoted in a brochure that features appreciations by Bob Hope and Branch Rickey and depicts celebrities including Katharine Hepburn and Risë Stevens wearing many of the jewels.[102] HWI, for its part, organized a Court of Jewels event in November 2010,[103] resulting in publicity valued at over $4 million.[104]

Beginning in the 1940s, Mr. Winston advertised his goods by lending them to celebrities for wear at "red carpet" events such as the motion picture industry's "Oscars" award ceremony.[105] Decades later, HWI continues to make use of the same marketing technique. Such product placement, known as "celebrity dressing," results in substantial publicity. Ms. Lacaze confirmed a statement in a newspaper

---

[100] *Id*. and Lacaze 49:10-50:21. Catherine Lacaze is the Vice-President – Jewelry Marketing of HWI.

[101] *See* Public Relations Analysis – Hope Diamond Re-Setting, including numerous press clippings, at Lacaze Exhibit 100.

[102] Lacaze Exhibit 101 (brochure of first tour); *see also* Lacaze Exhibit 102 (1951 brochure).

[103] Lacaze 28:3-5

[104] *Id*. 38:10-21 and Lacaze Exhibit 100.

[105] Burstein 28:16-23; Lacaze 15:22-16:7.

article that a "30-second spot on the Oscars" is worth approximately $1 million in publicity.[106] The record contains press notices regarding numerous celebrities appearing in public in HARRY WINSTON jewelry, including "Gwyneth Paltrow on the night where she received her Oscar," Meryl Streep, Queen Latifah and Marcia Gay Harden.[107] For the 67th Academy Awards in 1995, HWI issued a press release indicating that it had loaned its jewelry to be worn by eleven celebrities, including Joan Rivers, Claudia Schiffer, Jodie Foster, Uma Thurman, and Tim Robbins.[108] For the purpose of raising the visibility of its goods, HWI also makes outright gifts of jewelry to celebrities and arranges for grooming (such as makeup and hair care services) for celebrities who will appear at public events in connection with the HARRY WINSTON brand.[109] The record includes photographs of Lady Diana wearing HARRY WINSTON jewelry[110] and the wife of the Shah of Iran wearing "four pieces from her country's collection of Crown Jewels…. All were designed by Harry Winston."[111]

In 1953, in the motion picture "Gentlemen Prefer Blondes," the celebrated actress Marilyn Monroe sang the song "Diamonds Are a Girl's Best Friend," in the

---

[106] Lacaze 53:2-4, referring to Lacaze Exhibit 108.

[107] Lacaze 53:16-20 and Lacaze Exhibit 108.

[108] Lacaze Exhibit 109, "Harry Winston Jewels to Light Up Academy Awards." *See also* Mechbal Exhibit 41, showing images of Jennifer Lopez, Sandra Bullock, Halle Berry, Andrew Garfield, Sophia Vergara, Robert Downey, Jr., Angelina Jolie, and Christian Bale wearing HWI's jewelry at red carpet events.

[109] Lacaze Exhibit 110 (invoices for celebrity dressing and records of gifts).

[110] Burstein Exhibits 201-203.

[111] Burstein Exhibit 205, Town & Country, November 1975, cover and masthead page.

midst of which she spoke the words, "Talk to me, Harry Winston, tell me all about it."[112] On the DVD package for the film (Scott Exhibit 64), the song is touted as "legendary." Decades later, HWI has kept alive the advertising value of this promotional boon by continuing to use the line "Talk to me Harry Winston" in its advertising.[113]

In support of their case, opposers have submitted voluminous examples of promotional materials and advertisements for opposers' goods. They have also submitted substantial evidence of editorial press notices. *See* Lacaze Exhibit 124, an internal report of "The Value of Editorial Credits" for 2011, including press clippings, detailing references to HWI in journals including <u>Harper's Bazaar</u>, <u>Marie Claire</u>, <u>Town & Country</u>, <u>Elle</u>, <u>W</u>, <u>Interview</u>, <u>Vanity Fair</u>, <u>Wall Street Journal</u>, <u>People</u>, <u>Architectural Digest</u>, <u>Forbes</u>, <u>Details</u>, <u>Martha Stewart Weddings</u>, and many others. The report estimates the value of such editorial mentions in the millions of dollars.[114]

Opposers have presented testimony and documentation regarding the net sales of HWI from 1966 through 1997; and, for 1998 to 2011, net sales on a consolidated

---

[112] Scott III 51:14-17 and Scott Exhibit 64. *See also* Burstein Exhibits 211 and 213.

[113] *See* Burstein Exhibit 209 (<u>Daily Variety</u>, February 12, 2003), cover; Lacaze Exhibit 137; Lacaze Exhibit 162 at H 002350, H 002367-8, H 002372-3, and H 002385. *See also* Lacaze Exhibit 128, HW 1398-1404 (1997 Clip Report of press notices quoting "Talk to me Harry Winston").

[114] *See also* Lacaze Exhibits 128-130 (voluminous press clippings from various years); and Lacaze Exhibit 131 (2006 report of "Editorial Highlights").

basis for the entire Harry Winston Group.[115] The sales figures are extremely substantial. Mr. Scott also testified as to 2012 sales.[116]

Opposers have submitted testimony and documentation regarding expenditures on marketing and promotion for fiscal years 2001 through 2009, indicating extremely substantial annual expenditures.[117] Testimony for later years indicated very substantial increases in advertising expenditures over the 2009 level.[118]

The evidence indicates that HWI's extensive public relations efforts have successfully created for the company a very high profile among the general public having an interest in jewelry and fashion. We find that opposers have demonstrated that the word mark HARRY WINSTON is famous, for purposes of analysis under Trademark Act § 2(d), in the field of jewelry. This factor weighs in favor of a finding of likelihood of confusion.

Opposers' evidence is not focused on demonstrating fame of the mark WINSTON. Accordingly, we make no finding as to the purported fame of the mark WINSTON. However, the record does show that the press often has used WINSTON as an abbreviated reference to the HARRY WINSTON brand. *See, e.g.*, "Seeing Stars: Where the Stars Shop," at website of <womensforum.com> (references to "Winston jewels"; loans of jewelry by "Winston"; and "House of Winston"); and "The Legend of Winston," at website of <fashionlines.com> (references to "Winston

---

[115] Scott III 32:18-34:12; 35:24-36:18 and Scott Exhibit 58.

[116] Scott IV 11:7-9.

[117] Scott III 45:16-47:22 and Scott Exhibit 60.

[118] Scott IV 11:15-18 and 12:4. *See also* Lacaze 20:19-30:15 and Lacaze Exhibits 98 and 99 (detailed marketing department expenses for 2011).

jewels"; "Winston creation"; "a Winston"; "the Winston House"; and "House of Winston").[119] It is clear that WINSTON is very well known in the jewelry industry as an indicator of opposers as a source of goods.

### d.    The family relationship between the parties' founders.[120]

Mr. Bruce Winston, applicant's Chairman, is the son of Mr. Harry Winston, the man who founded HWI and ran it until 1978. The record indicates that this direct family relationship interacts with the fame of the mark HARRY WINSTON in a way that is significant in this case. The evidence shows that the father-son relationship between Harry Winston and Bruce Winston has been discussed in the press, whether accurately or inaccurately.[121] Because Harry Winston was a well-known figure and HWI's mark HARRY WINSTON is famous in the field of jewelry, the relationship between Harry Winston and Bruce Winston creates a higher degree of public excitement than would a relationship that did not involve a famous name. Bruce Winston has acknowledged that his relationship to his father is part of his public identity. When discussing his role in applicant's business, which included "Being Bruce Winston," he was asked "What does that mean to you?" He answered, "Son of a famous jeweler."[122] The record demonstrates the public's interest in

---

[119] Both at opposers' notice of reliance, TTABvue # 157.

[120] Although connected to the fifth *du Pont* factor of fame, we analyze the effect of the family relationship between the parties' founders under the rubric of the 13th *du Pont* factor, "any other established fact probative of the effect of use." *Du Pont*, 177 USPQ at 567.

[121] *See* opposers' notices of reliance at TTABvue ## 118 and 158.

[122] Bruce I 32:18-33:5.

Bruce's relationship to Harry. Press reports often use the name Bruce Winston to create a link to Harry Winston and HWI, even when there is no business affiliation.

Salient among the evidence is a detailed cover story in Avenue magazine profiling Stephanie Winston Wolkoff, who is Bruce's daughter and a woman of substantial achievements.[123] The story includes seven full-page photos showing Ms. Winston Wolkoff modeling high-fashion apparel, with designer credits. Each of the seven photographs includes a credit to Bruce Winston Gem for the jewelry worn in the photograph. In describing Ms. Winston Wolkoff's preparations for an event that she has organized, the article states, "She does not even bother to avail herself of the jewelers who offer to loan her something dazzlingly multi-carated for the night, but asks Mom and Dad -- Barbara and Bruce Winston of Bruce Winston Gem (he's Harry Winston's son) – instead."[124] We see, in this article, a fashion spread that prominently advertises applicant's jewelry, in which the writer adds interest to the story by means of a reference to opposers' founder.

Indeed, the press appears to be unable to resist promoting the connection to Harry Winston. A third-party website containing a biography of Ms. Winston Wolkoff lists under the category "Personal" the items "Daughter of Barbara Winston and Bruce Winston; Granddaughter of famed jeweler Harry Winston."[125] A website associated with Elle magazine stated in a profile of Ms. Winston Wolkoff, "As one of

---

[123] Avenue, September 2008, Scott III Exhibit 97.

[124] *Id.* at 89.

[125] Website of Panache Privee, Scott III, Exhibit 83.

the Harry Winston Winstons, she's got fine jewelry in her DNA."[126] In a series of profiles of married couples which included Ms. Winston Wolkoff and her husband, another website stated the following: "**Swank Lineage**: You may recognize Stephanie's maiden name. Her grandfather is *the* **Harry Winston** and father Bruce runs the company."[127] The New York Times, in its notice relating to her wedding, stated, "Just as on Oscar night, many guests were paying close attention to the jewelry in the room. 'In the Harry Winston tradition,' one guest whispered, 'the bride's mother is wearing a ring the size of an ice cube.'"[128] The record contains many other press notices that associate Bruce Winston's daughter with his father and the business of HWI, including references to her father as "an owner of the jewelry business," "the jewelry Winstons," and "the Harry Winston jewelry dynasty."[129] Such evidence demonstrates the eagerness with which members of the public may draw conclusions, not always entirely accurate,[130] regarding the

---

[126] Website of Elle, Scott III, Exhibit 84.

[127] "Familiar Fashion Faces in the NY Times' Wedding Announcements," <racked.com>, Scott III, Exhibit 85 (italics and bolding in original).

[128] "Weddings: Vows," The New York Times, March 26, 2000, Section 9, p. 9, Scott III Exhibit 86.

[129] *See* Scott Exhibits 87, 89, and 91-93.

[130] Opposers have sought to demonstrate through testimony that some of the information relayed in such articles is false. *See* Burstein 262:15 and 274:8 ff.; and Scott III 144:20-147:15. These contentions are based on testimony that Ms. Winston Wolkoff became a member of the Winston family through the marriage of her mother to Bruce Winston; that Bruce did not have a role in running HWI; and that any ownership by Bruce of HWI was solely a beneficial interest under a trust that owned HWI stock. We agree that in some particulars the press reports are inaccurate.

association between members of the Winston family on one hand and Harry Winston and opposers' business on the other.[131]

The record contains many examples indicating the public's strong interest in other persons associated with Mr. Harry Winston and a readiness to perceive a connection to Harry Winston and opposers' business. Charles Winston (Harry's great nephew), who has agreed with HWI not to promote his affiliation with Harry Winston or HWI,[132] recounted that even though he instructs the hosts of talk shows on which he appears as to that restriction, on occasion a host "will slip up and ask a question and I go (indicating) kill it right there…. I will have a conversation with them after the show and it does not happen a second time."[133] When confronted with a third-party website[134] offering a Charles Winston product and referring to him as "Winston, great nephew to Harry W[ ]" and stating "The Winston name is

---

[131] We note applicant's objection to all testimony and evidence relating to Ms. Winston Wolkoff. Applicant argues that she has no affiliation with applicant and her status as a daughter of Bruce Winston is not properly an issue in this proceeding. Applicant argues that published articles relating to Ms. Winston Wolkoff are impermissible hearsay and are irrelevant to the issues in dispute in this proceeding. Applicant argues that the testimony regarding Ms. Wolkoff's "activities and her motivations" is not based on personal knowledge; and that it will engender prejudice and confusion under Fed. R. Evid. 403. While statements in the published articles are not to be read for the truth of the matters asserted, the articles nonetheless are admissible and relevant to show the public's readiness to perceive a connection to opposers. It is clear to us that the Scott and Burstein testimony relating to Ms. Wolkoff's "motivations" provides no insight into Ms. Wolkoff's state of mind; but the testimony does provide the witnesses' interpretations of and reactions to the published articles, which we find relevant. We see no reason to believe that the Board's consideration of the manner in which Ms. Wolkoff became a member of the Winston family would unfairly prejudice applicant.

[132] Charles 110:23-111:3.

[133] *Id.* 111:9-14.

[134] Forever Jewelers website, Charles Exhibit 11.

synonymous [ ] best in the world of jewe[ ]",[135] he denied any connection to the website.[136] In discussing a website that offered his jewelry with references to "my family's business," jewelry for celebrities, "jewelry that previously could only be afforded by the rich and famous," and "the Winston Reputation,"[137] he described it as "copy that I approved prior to our settlement agreement," adding that "If this page still exists searchably, I'm going to have to contact them and tell them to take it down."[138] When asked whether business associates had "tried to take advantage of your connection to the Winston family," he replied emphatically in the affirmative.[139]

Other members of the family have found it useful to refer to their connection with Harry Winston. A website with the heading "Stephanie Winston Vann: Jewelry for My Generation" leads with the following text:

### Can You See the Real Me
From Park Avenue to Podunk Road…
Sporting more tattoos than diamonds…
Creating jewelry more suited for a Who concert than the Oscars…

### Who is this Winston???

Harry Winston was my father's father's brother… my [ ]
uncle and my great uncle. My father has been in the [ ]
business over fifty years. I think I worked at Harry W[ ]
Inc. for about a week in high school… Central Park be[ ]
and I was much more inclined to sport a denim jacke[ ]

---

[135] The text is incomplete on parts of the exhibit.

[136] Charles 61:17-62:4.

[137] ShopNBC website, Charles Exhibit 18.

[138] Charles 113:12-22.

[139] *Id*. 114:19-22.

> Frisbee than pantyhose and pearls. But what little girl [ ]
> love visiting Daddy at the office…[140]

Robert Scott discussed HWI's need to object to uses of the name Winston on a jewelry website of Susan Winston, who was the wife of Richard Winston, a long-time senior sales person of HWI.[141] She later made changes to the website.[142]

The evidence demonstrates a strong proclivity among the press and other third parties to spontaneously perceive and promote an association between applicant's founder and opposers' founder and a connection between their two businesses. This factor weighs in favor of a finding of likelihood of confusion.

### e. <u>Careful selection of goods.</u>

Applicant argues in its brief that opposers' goods are costly and that, as a result, they are certainly not an impulse purchase.[143] Applicant points to Ronald Winston's testimony that customers for HWI's goods sometimes will "buy it on the spot, sometimes there is a series of negotiations and considerations that last not one but a number of visits and either consummates a purchase or not. Usually after they have come in one time there is usually a purchase if they considered more than half an hour sitting at a desk in our store."[144] Opposers argue that the parties' customers have no particular expertise with respect to jewelry, are not sophisticated

---

[140] Ronald I Exhibit Q, TTABvue #96 at 409, a screenprint captured July 29, 2003, from the website http://www.stephaniewinstonvann.com/The_Real_Me~ns4.html.  Ellipses are in the original. The text of the printout is incomplete, as indicated by empty brackets [ ].

[141] Scott III 137:2-22.

[142] Scott IV 35:20-56:2 and Ex. 7.

[143] Applicant's brief at 31-32.

[144] Ronald I 109:18-25.

purchasers, and are sometimes subject to impulse. "People purchase expensive jewelry because they want to cash in on big gambling winnings or celebrate a vacation."[145] Thomas Burstein, Senior Vice President and Senior International Jewelry Specialist, Christies' Auctioneers, testified, "People shop, they go into a beautiful store, they see beautiful jewelry and it is an impulse buy. The necklace gets on their neck, they look gorgeous, and the money is out there to buy it."[146]

The testimony indicates that the parties' goods may in some cases be an impulse purchase, but that they usually are purchased after some consideration. Ms. Brodie Gelles testified that HWI's products are "both" impulse purchases and purchases subject to some consideration, but stated, "I think a jewelry purchase over $5,000 is one that was probably considered."[147] Ms. Korb said she believes that diamond engagement ring purchases and other types of jewelry purchases are "a considered purchase" as opposed to impulse purchases.[148] Describing the range of sophistication of HWI customers, she said, "I think there are many different kinds of customers. Some come in having done a lot of research. Some come in because of our reputation. Some come in with very little knowledge."[149]  On the other hand, Ronald Winston described a segment of athletes and rock musicians who may not

---

[145] Opposers' brief at 41.

[146] Burstein 35:18-22.

[147] Brodie Gelles 61:4-15.

[148] Korb 31:19-25.

[149] *Id*. at 32:8-12.

bring a great deal of care to their purchases;[150] and Mr. Nhaissi said that to some of applicant's customers $225,000 is not a great deal of money: "[T]o a guy worth a few billion dollars, it's not a lot of money, it's ashtray money."[151]

As the goods in the application are characterized as "gemstones" and "fine jewelry," this identification excludes low-end jewelry and directs our analysis to higher end jewelry. However, that still encompasses a wide range. Considering the full range of potential purchasers of the parties' goods and the full range of prices at which such goods are offered, we believe customers would bring an increased degree of care to the selection of the goods but there is no evidence that the customers themselves are particularly sophisticated purchasers or that they are in some other manner immune from trademark confusion. *See Stone Lion,* 110 USPQ2d at 1163 (noting that Board precedent requires decisions to be based on the least sophisticated of the relevant potential purchasers). This *du Pont* factor weighs against a finding of likelihood of confusion.

### f. **Actual confusion.**

The parties disagree as to whether the record demonstrates actual confusion involving the marks of opposers and applicant. Applicant points to statements of Ronald Winston and Robert Scott to the effect that they were not aware of any actual confusion.[152]

---

[150] Ronald I 107:8-14.

[151] Nhaissi I 113:10-18.

[152] Ronald II 21:18; Scott II 24:3.

Opposers, however, point to two incidents of alleged confusion. Opposers' brief at 42-43. One incident was recounted by Ms. Brodie Gelles, who said that people who were dealing with applicant contacted her and asked questions such as "do you know who Bruce Winston is, is he legitimate, is he a Winston, is he affiliated with Harry Winston, is it the same diamonds."[153] The second incident was related by Mr. Lewand, who said of certain antique and estate dealers, "A few of them knew [Bruce] was the son of Harry, and other than that they didn't know of him or his pieces of jewelry. … I believe it was … a friend of mine [who] said have you ever heard of Bruce Winston, because I have a piece here somebody is trying to sell him. He said does it have any value."[154] Inquiries of these kinds are sometimes interpreted as an indication that the inquirer is alert to the differences between the marks and skeptical of any relationship between them. *See, e.g.*, *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 206 USPQ 961 (1st Cir. 1980); *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 26 USPQ.2d 1583, 1588 (2d Cir. 1993); *cf. Steinway & Sons v. Demars & Friends*, 210 USPQ. 954, 1981 (C.D. Cal. 1981). Here, we find the testimony relating to these incidents to be too lacking in detail to demonstrate actual confusion. We therefore find that the record contains no evidence of actual confusion.[155]

---

[153] Gelles 52:22-53:3.

[154] Lewand 36:10-20.

[155] We note with some interest that Charles Winston testified that a customer once sent one of *his* products, "a $49 sterling silver cubic zirconia tennis bracelet," to HWI for repair, eliciting a "scathing letter" from Ronald. We give no weight to this incident inasmuch as there is no similarity in nature between the businesses of Charles and Bruce.

As a related matter, we consider the length of time during and conditions under which the parties' marks were used without evidence of confusion. Applicant indicates in its brief that between 2002 and 2011, it made sales in the millions of dollars.[156] However, as shown in applicant's digest of such sales, during that period applicant made sales to only a handful of customers.[157] (Several were repeat customers and the prices of individual sales were, as discussed above, extremely high.) The evidence also indicates that applicant's promotion and advertising expenses for the entire time of its existence (through 2011) were extremely small.[158] Mr. Nhaissi confirmed that applicant did very little print advertising, amounting to a few advertisements in Zink magazine and Yankees magazine.[159] Considering the very limited reach of applicant's business in the course of nine years, we question whether there has been a meaningful opportunity for confusion to arise with respect to the parties' marks. Accordingly, we consider the absence of evidence of actual confusion to be a neutral factor in our analysis.

g. **Similar marks in the marketplace.**

We next consider the number and nature of similar marks in use on similar goods in the marketplace. Applicant argues that opposers have allowed other Winston family members to use their names to market and sell jewelry,[160] and

---

[156] Applicant's brief at 20 and Exhibit 1 to brief; *see also* Nhaissi II 22:16 and Nhaissi II Exhibits 42 and 43.

[157] *Id.*

[158] Nhaissi II 25:22.

[159] Nhaissi I at 26-27 and Nhaissi Exhibits 21 and 22.

[160] Applicant's brief at 9.

points to the use of the business name "Jerry Winston Enterprises" by a nephew of Harry Winston prior to 1995, and the current use of the mark CHARLES WINSTON by Jerry Winston's son for costume jewelry.[161] Opposers point out that there are no other federal registrations of any mark containing the name WINSTON for jewelry, and that they have vigorously policed and stopped use of such marks by third parties.[162]

The record shows that Jerry Winston was Harry's nephew, and that Harry took a fatherly interest in him. He worked within HWI and "headed up the loose diamond division" until the late 1960s or early '70s,[163] at which time he started a business called Jerry Winston Enterprises in New York City. Charles, his son, described the business as "selling loose diamonds unbranded."[164] Both Ronald and Charles described this company as "a wholesale business,"[165] meaning that it sold "to other dealers or jewelers."[166] Ronald testified:

> And as I recall, my father didn't like it, but he didn't ever object to Jerry Winston putting his name on the door of his company.
> … Then my father came to me in, probably, '72, '73 and said, "Jerry's decided to give up his brand and to come back to the family, but as the heir [ap]parent, I want you to give it your blessing. So I had a dinner with Jerry Winston in a restaurant on East 57th Street around 1972, and Jerry pledged that he was going to be loyal to the

---

[161] *Id.* at 24-26.

[162] Opposers' brief at 43-44; opposers' reply brief at 14 and 22-24.

[163] Ronald II 23:2-24. *See also* Charles 10:15-18 and 11:24-12:7.

[164] Charles 80:8-81:9.

[165] Ronald II 33:24-25; Charles 80:8-81:9.

[166] Ronald II 34:5-8.

> family, not keep his name out there, and how he was
> going to rejoin the family forever.

Ronald II 33:18-36:7.

However, after Harry's death in 1978, Jerry left HWI again and resumed his own business, which he continued until approximately 1995 or 1997.[167]

The record shows that Charles Winston is the son of Jerry. As a young man, he worked for HWI from 1974 to 1978, grading, sorting and selecting diamonds.[168] Thereafter he worked as an independent sales representative for wholesale jewelry companies.[169] In the 1980s, he organized a company called Charles Winston Inc. (or Charles Winston Enterprises), which assembled jewelry for others as a subcontractor.[170] In 1997, he began appearing on television shopping networks, selling primarily jewelry items made of sterling silver set with cubic zirconia.[171] In this field, the CHARLES WINSTON and CHARLES WINSTON COLLECTION brands began to develop, and he sold several million dollars' worth of product annually.[172] However, this endeavor also attracted disapproval from Ronald who "was quite upset with me" because Charles had talked about the Winston family lineage on-the-air.[173]

---

[167] Ronald II 36:12-16; Charles 81:8.

[168] Charles 8:10-9:1.

[169] *Id.* 14:19-15:1.

[170] *Id.* 17:4-18:6.

[171] *Id.* 20:7-17; 23:22-24.

[172] *Id.* 23:16-19.

[173] *Id.* 20:20-21:10.

Charles' enterprises continued at the time of trial, but it is clear that opposers have imposed restraints upon him. A federal suit against three of his related businesses resulted in a stringent consent judgment and permanent injunction.[174] Another result of the same action is a settlement agreement binding Charles personally and CWE Consulting Corporation. The agreement places a series of restrictions on the use of the designation CHARLES WINSTON, including provisions dealing with use of the designation WINSTON alone; broad prohibitions on U.S. registration; limitations on types of products and price restrictions on goods sold, effectively guaranteeing that the goods will not be remotely competitive with those of HWI; prohibitions on certain ways of describing Charles' business and statements regarding Charles' family relationship to Harry; and an ultimate expiration of the right to use CHARLES WINSTON on certain goods.[175] It is clear from Charles' testimony that he takes pains to comply with the terms of the agreement.[176]

Applicant does not address in its brief any other specific third-party users of WINSTON marks. The record does contain a handful of references to third-party users of such marks;[177] but there is little or no information regarding such users and the extent to which their marks have made an impact on the marketplace, if

---

[174] *Harry Winston, Inc. and Harry Winston, S.A. v. Charles Winston Luxury Group, LLC and LP Watch Group, Inc. and CWE Consulting Corporation*, Case No. 2:08-CV-536, United States District Court for the Southern District of Ohio, Eastern Division.

[175] *See* Charles Exhibit 23.

[176] *See* Charles 110:23-111:3; 111:9-14.

[177] *See* applicant's notice of reliance on opposers' responses to requests for admissions, Exhibits 33 and 34, TTABvue ## 178-185. *See also* discussion above in Part VII(C)(3)(d).

any. Some of that evidence consists of cease-and-desist letters to such third-parties.[178] Applicant appears to suggest that if any such offensive third-party uses remain unresolved, it reflects opposers' decision to give up their objections; but opposers have specifically denied any such acquiescence.[179] In fact, opposers made of record evidence showing that they often pursue such matters to a successful conclusion. *See* Scott IV Exhibits 4 and 5 (settlement agreement and injunction in lawsuit); Exhibit 6 (settlement agreement pertaining to suit for inappropriate reference to "Harry Winston" in apparel advertising); Scott IV 35:20-36:2 and Exhibit 7 (witness instructed that cease-and-desist letter be sent for inappropriate family references on website);[180] Scott IV 36:3-13 (witness has instructed attorneys to bring lawsuit for infringement).

On this record, we see no indication that opposers' marks HARRY WINSTON and WINSTON have been meaningfully weakened in their source-indicating power by widespread third-party use of similar marks. Opposers have taken meaningful steps to control and neutralize the impact of the CHARLES WINSTON mark and to ensure that its use will be limited to the noncompeting field of inexpensive costume jewelry. The JERRY WINSTON mark has been out of use for several years and there is no evidence to indicate that it maintains any significant recognition in the marketplace. Moreover, while it was in use it was limited to wholesale use in connection with jewelry components sold within the industry, rather than finished

---

[178] *Id.*

[179] *Id.*, opposers' responses to requests for admission Nos. 33(b) and 34(b), TTABvue # 185.

[180] Susan Winston is the wife of Ronald's cousin Richard Winston.

jewelry sold to the public. With respect to other third-party users of WINSTON marks, there is no evidence to indicate their market reach. Moreover, opposers appear to undertake commercially reasonable efforts to prevent or minimize such use. Accordingly, we find the *du Pont* factor of the number of similar marks in use in the marketplace to be neutral for purposes of our analysis.

### h. Market interface between the parties.

In 2009, applicant brought a declaratory judgment action against opposers;[181] this Board proceeding was suspended during the pendency of that case. According to opposers' characterization, the action sought an order that applicant's mark BRUCE WINSTON be registered; and a declaration that applicant's use of the mark BRUCE WINSTON on jewelry does not infringe opposers' trademark rights.[182] Opposers brought a motion to dismiss on the ground that the court lacked subject matter jurisdiction due to a lack of a present case or controversy between the parties, and a hearing on the motion was held on September 2, 2010. Applicant submitted a transcript of the hearing under a notice of reliance.[183] Opposers entered the court's decision, granting the requested dismissal, as an exhibit in cross-examination of Mr. Nhaissi.[184]

---

[181] *Bruce Winston Gem Corp. v. Harry Winston, Inc. and Harry Winston, S.A.*, 09 CV 7352, in the United States District Court for the Southern District of New York.

[182] Opposers' reply brief at 12.

[183] TTABvue # 176. The hearing transcript is not certified, but opposers did not object and they discussed it in their briefs. Accordingly, we consider it.

[184] Nhaissi II, opposers' Exhibit 6. The decision was reported as *Bruce Winston Gem Corp. v. Harry Winston, Inc. and Harry Winston, S.A.*, 2010 U.S. Dist. LEXIS 96974.

Applicant contends that opposers, in arguing for dismissal on subject matter jurisdictional grounds, stated that there is no actual market conflict between applicant and opposers; that opposers' only interest was in preventing the registration of applicant's mark; and that these admissions require dismissal of the present opposition proceeding.[185] Opposers essentially admit that they argued to the court that they did not at that time object to applicant's ongoing business activities on grounds of trademark infringement; but opposers argue that this fact is irrelevant to the question of registration before this Board. The court's decision states the issues in an instructive manner:

> BWG has operated its small and personal business selling jewelry other than through retail outlets. … Even taking all of the asserted BWG activities into account, HWI does not assert that those actions have violated HWI's marks and has represented to the Court that it has no intent to stop those activities. …

> The defendants [opposers], however, rightly object to a declaratory judgment action that would be an action to determine what activities BWG could engage in that it has not yet engaged in and which it did not have any intent or ability to pursue. The defendants rightly object to the use of a declaratory judgment action to construct the future framework of the interaction between the parties….

> There are numerous hypothetical situations that could cause actual conflicts between the parties. For example, while the defendants have not objected to the plaintiff's advertisements or signs, it is conceivable that future advertisements could be misleading or deceptive. While the plaintiff has not presented any plans for a retail store,… the defendants might well object to such plans, depending on all the circumstances.

---

[185] Applicant's brief at 42.

2010 U.S. Dist. LEXIS 96974, *12-14.

The Court's comments clearly illustrate why opposers' "admissions" to the Court do not necessarily require a dismissal of their claims in this opposition proceeding. The registration sought by applicant, if granted, could potentially have perpetual duration. The registration requested in the application is not limited to the types of commercial activities that applicant was engaged in at the time of trial; rather, the registration's protections would apply to use of the mark in connection with all of the goods identified in the application, as marketed through all normal trade channels for such goods and to all normal customers for such goods. *Octocom,* 16 USPQ2d at 1787; *Paula Payne Products*, 177 USPQ 76. Accordingly, opposers' representations as to whether they objected to applicant's activities as they existed at the time of the declaratory judgment action, while relevant to the question of whether a case or controversy under Article III of the Constitution then existed, have little, if anything, to do with the question of whether a federal registration, with its accompanying presumptions, should be granted to applicant according to the terms requested in the application.

### i. <u>The similarity or dissimilarity of the marks.</u>

Finally, we consider the similarity or dissimilarity of the parties' marks in terms of appearance, sound, meaning, and overall commercial impression. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005). We will focus on opposers' common law mark HARRY WINSTON, because that mark has been demonstrated

to be famous for goods identical to those of applicant;[186] and on HWI's registered mark WINSTON, because that mark is registered for goods identical to those of applicant. We must base our determination on a comparison of each of these marks, in their entireties, with applicant's mark. *In re National Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). *See also Franklin Mint Corp. v. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 23, 234 (CCPA 1981). However, an analysis of individual aspects of the marks is a permissible part of our determination. *Price Candy Company v. Gold Medal Candy Corporation,* 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955). "The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012) (citation omitted).

Clearly BRUCE WINSTON is not identical to either WINSTON or HARRY WINSTON. It is equally obvious that each of the marks consists, in whole or in part, of the surname WINSTON. Nothing in the record suggests that WINSTON has any inherent significance other than as a surname. Accordingly, to the extent that the three marks under consideration share the designation WINSTON, they are at least in part identical in sound, appearance, and commercial impression.

In comparing BRUCE WINSTON with WINSTON, we note that applicant's mark encompasses the entire registered mark. Applicant has added the given name

---

[186] HWI also owns a registration of HARRY WINSTON in special form with an HW monogram, which relates to goods identical to those of applicant. Reg. No. 1747040.

BRUCE, but the addition of a given name to a recognizable surname has limited distinctive capability. A surname preceded by a given name is a common, highly conventional combination of word elements, and the mark BRUCE WINSTON could well be interpreted as a more specific reference to a person or company that is otherwise identified by the designation WINSTON. *In re Chatham International Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1946 (Fed. Cir. 2004) ("the first name JOSE modifies the surname GASPAR and serves to emphasize that GASPAR is a name"; JOSE GASPAR GOLD likely to be confused with GASPAR'S ALE); *In re SL&E Training Stable Inc.,* 88 USPQ2d 1216, 1219 (TTAB 2008) ("The first name 'Sam' in applicant's mark modifies the surname 'Edelman,' in effect, telling which Edelman it is, and therefore emphasizes the 'Edelman' portion." SAM EDELMAN likely to be confused with EDELMAN); *Audemars Piguet, Ltd. v. Hammerman Bros, Inc.*, 181 USPQ 843 (TTAB 1974) (in comparing the marks AUDEMARS PIGUET and PIQUETTE, the Board stated "it is not believed that the addition of the given name to opposer's mark is sufficient to distinguish these marks"); *Somerset Distilling Inc. Speymalt Whisky Distributors Ltd.*, 14 USPQ2d 1539 (TTAB 1989) (JAS. GORDON likely to be confused with GORDON'S). Several cases have commented on the propensity of consumers to shorten names. *See Nina Ricci S.A.R.L. v. E.T.F. Enterprises Inc.*, 889 F.2d 1070, 12 USPQ2d 1901, 1903 (Fed. Cir. 1989) ("the Board has previously recognized the practice in the fashion industry of referring to surnames alone"); *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 USPQ2d 1321, 1333 (TTAB 1992) ("companies are frequently called by shortened names, such as Penney's for J.C. Penney's, Sears for Sears and Roebuck..., Ward's for Montgomery

Ward's, and Bloomies for Bloomingdale's); *Big M. Inc. v. United States Shoe Corp.*, 228 USPQ 614, 616 (TTAB 1985) ("[W]e cannot ignore the propensity of consumers to often shorten trademarks and, in the present case, this would be accomplished by dropping the 'T.H.' [in T.H. MANDY] in referring to registrant's stores"); and *Polo Fashions, Inc. v. La Loren, Inc.*, 224 USPQ 509, 512 (TTAB 1984) ("Lauren" is a shorthand term for Ralph Lauren).

Applicant's brief alleges (without substantial argument) that WINSTON lacks acquired distinctiveness.[187] However, such an argument is ineffective against the pleaded registration of WINSTON because the registration is both more than five years old and incontestable and cannot be challenged on grounds of nondistinctiveness. Trademark Act § 14, 15 U.S.C. § 1064; *Park 'N Fly v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 330 (1985) ("The language of the Lanham Act … refutes any conclusion that an incontestable mark may be challenged as merely descriptive.")

The actual thrust of applicant's argument with respect to the similarity of its mark to the mark WINSTON (other than the claim that WINSTON has been abandoned, which we have already considered and rejected) is that opposers have not demonstrated that the mark is famous.[188] We may, of course, consider the strength or weakness of the mark WINSTON. A surname such as WINSTON would ordinarily suffer some inherent weakness as a source identifier. However, in the

---

[187] Applicant's brief at 35.

[188] Applicant's brief at 35-37.

present case there is no question that opposers' use of WINSTON in the field of jewelry has resulted in substantial market recognition and has become a strongly distinctive trademark, as we have discussed above in Part VII(C)(3)(c).

Giving regard to the foregoing considerations, we find that the similarity between the marks BRUCE WINSTON and WINSTON weighs heavily in favor of a finding of likelihood of confusion.

In comparing the marks BRUCE WINSTON and HARRY WINSTON, it is clear that each is in the form of a male given name plus surname; and it is obvious that BRUCE and HARRY are different in appearance and sound. Applicant does not directly argue as to why the distinction between BRUCE and HARRY should be sufficient to avoid confusion. Opposers do address the issue, and they point to a number of cases in which marks that shared a common surname but differed by virtue of added given names were found likely to cause confusion. *See Nina Ricci*, 12 USPQ2d at 1903 (NINA RICCI and VITTORIO RICCI);[189] *Jack Winter Inc. v. Lancer of California, Inc.*, 183 USPQ 445 (TTAB 1974) (JACK WINTER and DAVID WINTER); *Girard-Perregaux & Cie, S.A. v. Perregaux,* 122 USPQ 95, 96 (Comm'r. Pats. 1959) (PAUL PERREGAUX and GIRARD PERREGAUX). Giving due regard to the differences between BRUCE WINSTON and HARRY WINSTON, we must

---

[189] In *Nina Ricci*, the Court compared the mark VITTORIO RICCI to an opposer's marks NINA RICCI, MADEMOISELLE RICCI, SIGNOR RICCI and CAPRICCI. The Court pointed to several factors that "argue against according controlling weight to the differences in the marks based solely on the use by the parties of dissimilar first names." These factors were the unifying and dominant term RICCI in the opposer's marks; a practice in the fashion industry of referring to surnames alone; the fame of the opposer's mark "inasmuch as less care may be taken in purchasing a product under a famous name"; and expanding sales in many lines of goods under opposer's marks.

also bear in mind that when identical goods are at issue, the degree of similarity of the marks that is necessary to find a likelihood of confusion is not as great as where the goods are disparate. *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992). Moreover, we have found HARRY WINSTON to be famous in the field of jewelry and, as opposers note, a famous mark "casts a long shadow which competitors must avoid." *Bose v. QSC*, 63 USPQ2d at 1305). *See also Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 22 USPQ2d at 1456 ("The Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark"). Famous marks are given a broad scope of protection "because of the tendency of the consuming public to associate a relatively unknown mark with one to which they have long been exposed if the mark bears any resemblance thereto." *R. J. Reynolds Tobacco Co. v. R. Seelig & Hille*, 201 USPQ 856, 860 (TTAB 1978). Accordingly, we find that the commonality of the designation WINSTON in the marks BRUCE WINSTON and HARRY WINSTON creates sufficient similarity to weigh in favor of a finding of likelihood of confusion.[190]

### j. Balancing the factors.

We have considered all of the evidence of record and all arguments of the parties relevant to the issues before us, including those not specifically discussed

---

[190] With respect to both WINSTON and HARRY WINSTON, we have considered applicant's contention that their strength has been diluted by current use of the mark CHARLES WINSTON and former use of the mark JERRY WINSTON. As discussed above in Part VIII(C)(3)(g), we do not find that the strength of opposers' marks has been meaningfully affected by such third-party use.

herein. Our analysis of the *du Pont* factors leads us to find that applicant's mark, as used in connection with the identified goods, so closely resembles opposers' earlier used and registered marks as to be likely to cause confusion, mistake or deception as to the source of applicant's goods.

### D.      Opposers' claim of fraud.

Inasmuch as we have determined that registration of applicant's mark must be refused registration on grounds of likelihood of confusion, there is no need for us to consider opposers' claim of fraud.

**<u>Decision:</u>**

The Board's decision on all claims and counterclaims (including those disposed of by earlier orders in this proceeding) is as follows:

1. The counterclaim petition to cancel Reg. No. 2538811 was dismissed without prejudice, inasmuch as all allegations of ownership thereof were stricken from opposers' notice of opposition. Board order of April 16, 2007.

2. The counterclaim petition to cancel Reg. No. 1457928 was granted by Board order of September 29, 2008.

3. The counterclaim petition to cancel Reg. No. 1457927 was granted by Board order of July 17, 2012.

4. The counterclaim petition to cancel Reg. No. 0848629 on grounds of abandonment and fraud is dismissed with prejudice.

5. The counterclaim petition to cancel Reg. No. 1747040 on grounds of fraud is dismissed with prejudice. The petition for partial cancellation of Reg. No. 1747040 on grounds of abandonment is granted as to "table watches," "pocket watches," "alarm clocks," "jewelcases in precious metals, precious and semi-precious stones," and "bracelet fasteners"; and those goods shall be deleted from the goods identified in the registration.

6.    The petition for partial cancellation of Reg. No. 2461192 on grounds of abandonment is granted as to "precious metals and their alloys sold in bulk" and "clocks." Those goods have already been deleted from the registration.

7.    The counterclaim petition to cancel Reg. Nos. 2112912 and 2390073 on grounds of abandonment and fraud is dismissed with prejudice as waived.

8.    The counterclaim petition to cancel Reg. No. 2593490 is dismissed as moot.

9.    The opposition is sustained on grounds of likelihood of confusion under Trademark Act § 2(d), 15 U.S.C. § 1052(d); and registration of applicant's mark is refused.